# HARTFORD FIRE INSURANCE COMPANY *v.* CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 5.    Argued November 11, 12, 1897. — Decided November 6, 1899.

Questions of public policy, as affecting the liability for acts done, or upon contracts made and to be performed, within one of the States of the Union — when not controlled by the Constitution, laws or treaties of the United States, or by the principles of the commercial or mercantile law or of general jurisprudence, of national or universal application — are governed by the law of the State, as expressed in its own constitution and statutes, or declared by its highest court.

A lease to a commercial partnership from a railroad corporation of a strip of its land by the side of its track in the State of Iowa, for the purpose of erecting and maintaining a cold storage warehouse thereon, contained an agreement that the corporation should not be liable to the partnership for any damage to the building or contents, by fire from the locomotive engines of the corporation, although owing to its negligence. At the trial of an action brought in the Circuit Court of the United States by the partnership against the corporation to recover for damage to the building and contents by fire from its locomotive engines, owing to its negligence, under a statute of the State making any railroad corporation liable for damage to property of others by fire from its locomotive engines, the plaintiff contended that the agreement was void as against public policy. It appeared that, since this lease, the highest court of · the State, in an action between other parties, had at first held a like agreement to be void as against public policy, but, upon a rehearing, had reversed

its opinion, and entered final judgment affirming the validity of the agreement; and it also appeared that its final decision was not inconsistent with its decision or opinion in any other case. *Held*, that the question of the validity of the agreement was one of statutory and local law, and not of the commercial law, or of general jurisprudence ; and that the final decision of the state court thereon was rightly followed by the Circuit Court of the United States.

THE case is stated in the opinion.

*Mr. Charles A. Clark* and *Mr. Richard W. Barger* for plaintiffs in error and petitioners.

*Mr. Charles B. Keeler* and *Mr. George R. Peck* for defendants in error and respondents.

MR. JUSTICE GRAY delivered the opinion of the court.

This was an action brought May 10, 1893, in the district court of Jones County in the State of Iowa, against the Chicago, Milwaukee and St. Paul Railway Company, a railroad corporation of Wisconsin, by seven fire insurance companies, corporations of other States, to recover for the loss by fire, owing to the defendant's negligence, of a warehouse and goods, belonging to the partnership of Simpson, McIntire & Company, and insured by the plaintiffs, who had paid the loss.

The petition alleged that on November 11, 1892, and long before, the partnership was doing business at Monticello in that county, and there owned a cold storage warehouse, situated upon railroad ground by the side of the railway track of the defendant in Monticello, and containing a valuable stock of butter and eggs; that on that day the defendant, while running its engines and cars on its railway track alongside of the warehouse, negligently set fire to and destroyed the warehouse and its contents to the value of $27,118 ; that at the time of the fire the partnership held policies of insurance against fire on this property from each of the plaintiffs, and was afterwards paid by them, under those policies, the aggregate sum of $23,450 ; and that the plaintiffs thereby

became, to that extent, subrogated to the partnership's right against the defendant, and were entitled to judgment against it for the sum so paid, with interest.

The defendant, on May 23, 1893, removed the case into the Circuit Court of the United States for the District of Iowa, and in that court, on September 12, 1893, filed an answer, admitting that the parties to the action were corporations, and that the partnership was doing business at Monticello, as alleged, but denying all the other allegations of the petition.

On April 2, 1894, by leave of court, an amended answer was filed, alleging that the land on which the warehouse stood belonged to the defendant as part of its depot grounds at Monticello; and that the sole right and occupancy of the partnership therein were by virtue of an indenture of lease, dated February 1, 1890, executed by the defendant and by the partnership, under which the partnership entered into and thenceforth occupied the land, and which was set forth in the answer, and was as follows:

The defendant leased the land, (describing it by metes and bounds, showing it to be a strip, one hundred and thirty feet long and fifty-five feet wide, part of its depot grounds, and by the side of its track,) to the partnership, " to hold for the term of one year from the date hereof, for the purpose of erecting and maintaining thereon a cold storage warehouse, the said lessee yielding and paying therefor the annual rent of five dollars in advance: and upon the express condition that the said railway company, its successors and assigns, shall be exempt and released, and said parties of the second part, for themselves and for their heirs, executors and administrators and assigns, do hereby expressly release them, from all liability or damage by reason of any injury to or destruction of any building or buildings now on, or which may hereafter be placed on, said premises, or of the fixtures, appurtenances or other personal property remaining inside or outside of said buildings, by fire occasioned or originated by sparks or burning coal from the locomotives, or from any damage done by trains or cars running off the track, or from carelessness or negligence of employés or agents of said railway com-

pany; and further, that the said parties of the second part will in no way obstruct or interfere with the track of said railway company in using said premises.

"And the parties of the second part agree to keep said premises in as good repair and condition as the same are in at the commencement of said term; to pay, as the same become due and payable, all taxes and assessments, general and special, that may be levied or assessed thereon during the time they remain in possession thereof; and to quit and surrender said premises at the expiration of said term, on demand of said railway company; and, in case such demand shall not be made at the expiration of said term, to pay said rent, at the rate and in the instalments aforesaid, as long as they remain in possession thereof; and that they will not underlease said premises without the written consent of said railway company.

"And said parties of the second part further agree to quit and surrender said premises at any time before the expiration of said first-mentioned term, or at any time when default shall be made in the payment of said rent or taxes as aforesaid, within thirty days after demand of said railway company; and that upon the expiration of said thirty days, it shall be lawful for said railway company to expel them therefrom.

"The parties of the second part may (and hereby agree that they will, if said railway company shall so require,) remove from said premises, within thirty days after any termination of this lease, all structures owned or placed thereon by them."

The amended answer concluded by alleging "that from the first day of February, 1890, down to and including the time of said fire, Simpson, McIntire & Company remained in possession and occupancy of said premises under the terms and conditions of said original lease, and not otherwise; and were and continued to be tenants holding over under the lease aforesaid, and subject to all its provisions; and that, as to the alleged destruction by fire of the building and property mentioned in the plaintiffs' petition, all such risks, and the loss therefrom, were assumed by said Simpson, McIntire & Company, and this defendant company was released therefrom, as one of the

express conditions of said lease and occupancy, and plaintiffs cannot now recover therefor. Wherefore the defendant prays judgment herein."

The plaintiffs demurred to the amended answer, on the ground that the stipulation in the lease, by which it was sought to exonerate the defendant from loss by fire caused by the negligence of itself or its servants, was void as against public policy.

At the argument of the demurrer in the Circuit Court of the United States at April term 1894, before Judge Shiras, (as is shown by his opinion copied in the record, and printed in 62 Fed. Rep. 904,) it appeared that a case between other parties, involving the question at issue in this case, was then pending before the Supreme Court of the State of Iowa, under the following circumstances: In that case, entitled *Griswold* v. *Illinois Central Railroad,* that court, on October 19, 1892, (by an opinion reported only in 53 Northwestern Reporter, 295,) had held a similar stipulation to be void as against public policy; but, on February 3, 1894, upon a rehearing, had held to the contrary, and had sustained the validity of the stipulation, two judges dissenting. 90 Iowa, 265. A second petition for rehearing was then filed, and was still pending in that court. Under those circumstances, Judge Shiras suspended action on the demurrer, awaiting the final decision of the Supreme Court of the State. That court afterwards denied the second petition for rehearing, thereby finally affirming the validity of the stipulation; and thereupon Judge Shiras, at September term 1894, overruled the demurrer, and, the plaintiffs declining to plead further, rendered judgment for the defendant.

That judgment was unanimously affirmed by the Circuit Court of Appeals, upon the ground that the stipulation was valid, and was not against public policy; Judges Sanborn and Thayer, however, expressing the opinion (Judge Caldwell non-concurring in this respect) that the decision of the state court was not conclusive upon this question. 36 U. S. App. 152. The plaintiffs thereupon applied for and obtained this writ of certiorari.

This action against a railroad corporation, for the loss by fire, owing to its negligence in running its engines and trains, of a cold storage warehouse and the goods therein, owned by a commercial partnership, is brought by insurers of the property, who had paid to the partnership the greater part of the loss, and whose right, thereby acquired by way of subrogation, to recover against the railroad company to the extent of the amount so paid, is but the same right that the partnership had. *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312.

It is important, therefore, in the first place, to ascertain exactly what were the relations between the railroad company and the partnership.

The warehouse stood upon a strip of land, belonging to the railroad company, by the side of its track, and part of its depot grounds at Monticello in the State of Iowa. The sole right of the partnership in that strip was by virtue of an indenture of lease thereof, dated February 1, 1890, by which the railroad company leased it to the partnership for a year from that date, " for the purpose of erecting and maintaining thereon a cold storage warehouse," at an annual rent of five dollars payable in advance, " and upon the express condition that the said railway company, its successors and assigns, shall be exempt and released," and the lessees " do hereby expressly release them," from all liability or damage by reason of any destruction or injury of buildings then upon or afterwards placed on the land, or of personal property inside or outside of those buildings, " by fire occasioned or originated by sparks or burning coal from the locomotives, or from any damage done by trains or cars running off the track, or from the carelessness or negligence of employés or agents of said railway company ; " and the lessees covenanted in no way to obstruct or interfere with the track of the railroad company. The rest of the indenture consisted of covenants of the lessees to keep the premises in repair ; to pay the rent and taxes so long as they remained in possession ; to surrender possession to the lessor, at the expiration of the term, if then demanded, or, before its expiration, or on default in payment of rent or taxes,

within thirty days after demand; and not to underlease without the lessor's consent; with a further agreement that the lessees might, and, if required by the lessor, would, remove from the premises, within thirty days after any termination of the lease, all structures owned or placed thereon by them.

The indenture, in short, is a lease by the railroad company of a strip of its land by the side of its track to the partnership, for the purpose of erecting and maintaining a cold storage warehouse thereon, for one year and for such longer time as the lessee may be permitted by the lessor to remain in possession; and contains no further agreements, other than those usual between lessor and lessee, except a covenant of the lessee not to obstruct or interfere with the railroad track of the lessor; and an express condition of the lease, and covenant of the lessee, that the lessor shall not be liable to the lessee for any damage to the building or to personal property in or about it, by fire from the lessor's locomotive engines, or by trains or cars running off the railroad track, although owing to the negligence of the lessor or its servants.

The indenture contains no stipulation concerning, or even any mention of, any transportation of goods over the railroad, or any relation of the railroad company as a common carrier to the lessee or to the public; and there is nothing in the record to show that such a relation existed between the railroad company and the lessee, or that the warehouse was built or maintained for the benefit of the public, or of the railroad corporation, or of any one but the partnership.

The decision of the case turns upon the question whether the provision of this indenture, by which the railroad company is not to be liable for damage to the property by fire from its locomotive engines, owing to the negligence of itself or its servants, is void as against public policy.

The plaintiffs' counsel at the argument much relied on the cases in which similar provisions in the contracts of common carriers, or of telegraph companies, have been held to be void.

It is settled by the decisions of this court that a provision, in a contract between a railroad corporation and the owner

of goods received by it as a common carrier, that it shall not be liable to him for any loss or injury of the goods by the negligence of itself or its servants, is contrary to public policy, and must be held to be void in the courts of the United States, without regard to the decisions of the courts of the State in which the question arises. But the reasons on which those decisions are founded are, that such a question is one of the general mercantile law ; that the liability of a common carrier is created by the common law, and not by contract ; that to use due care and diligence in carrying goods intrusted to him is an essential duty of his employment, which he cannot throw off ; that a common carrier is under an obligation to the public to carry all goods offered to be carried, within the scope and capacity of the business which he has held himself out to the public as doing ; and that, in making special contracts for the carriage of such goods, the carrier and the customer do not stand on equal terms. *Railroad Co.* v. *Lockwood*, 17 Wall. 357 ; *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397, 439–442, and other cases there cited. Although a telegraph company is not a common carrier, yet its relation with senders of messages over its lines is of a commercial nature, and contracts that the company shall not be liable for the negligence of its servants, are affected, in some degree, by similar considerations. *Express Co.* v. *Caldwell*, 21 Wall. 264, 269 ; *Western Union Tel. Co.* v. *Texas*, 105 U. S. 460, 464 ; *Primrose* v. *Western Union Tel. Co.*, 154 U. S. 1 ; *Western Union Tel. Co.* v. *Cook*, 15 U. S. App. 445 ; *Harkness* v. *Western Union Tel. Co.*, 73 Iowa, 190.

The plaintiffs further insisted that the same reasons apply universally, and should be held to defeat all contracts by which a party undertakes to put another at the mercy of his own faulty conduct. But the only authorities cited which support this proposition are a general statement in. Cooley on Torts, 687, and an *obiter dictum* in *Johnson* v. *Richmond & Danville Railroad*, 86 Virginia, 975, 978 ; and it is certainly too sweeping. Even a common carrier may obtain insurance against losses occasioned by the negligence of himself or of

his servants, or may, by stipulation with the owner of goods carried, have the benefit of such insurance procured thereon by such owner. *Phœnix Ins. Co.* v. *Erie Transportation Co.*, 117 U. S. 312; *California Ins. Co.* v. *Union Compress Co.*, 133 U. S. 387, 414; *Wager* v. *Providence Ins. Co.*, 150 U. S. 99.

A railroad corporation holds its station grounds, railroad tracks and right of way, for the public use for which it is incorporated, yet as its private property, and to be occupied by itself or by others, in the manner which it may consider best fitted to promote, or not to interfere with, the public use. It may, in its discretion, permit them to be occupied by others with structures convenient for the receiving and delivering of freight upon its railroad, so long as a free and safe passage is left for the carriage of freight and passengers. *Grand Trunk Railroad* v. *Richardson*, 91 U. S. 454. And it must provide reasonable means and facilities for receiving goods offered by the public to be transported over its road. *Covington Stockyards* v. *Keith*, 139 U. S. 128. But it is not obliged, and cannot even be compelled by statute, against its will, to permit private persons or partnerships to erect and maintain elevators, warehouses or similar structures, for their own benefit, upon the land of the railroad company. *Missouri Pacific Railway* v. *Nebraska*, 164 U. S. 403.

In the case at bar, no one had the right to put a warehouse or other building upon the land of the railroad corporation without its consent; and the corporation was under no obligation to the public, or to the partnership, to permit the latter to do so. In granting and receiving the license from the corporation to the partnership to place and maintain a cold storage warehouse upon a strip of such land by the side of the railroad track, and in erecting the warehouse thereon, both parties knew that its proximity to the track must increase the risk of damages, whether by accident or by negligence, to the warehouse and its contents, by fire set by sparks from the locomotive engines, or by trains or cars running off the track. The principal consideration, expressed in their contract, for the license to build and maintain the warehouse on this strip

of land, was the stipulation exempting the railroad company from liability to the licensee for any such damages. And the public had no interest in the question which of the parties to the contract should be ultimately responsible for such damages to property placed on the land of the corporation by its consent only.

The case is wholly different from those, cited by the plaintiffs, in which a lease by a railroad corporation, transferring its entire property and franchises to another corporation, and thus undertaking to disable itself from performing all the duties to the public imposed upon it by its charter, has been held to be *ultra vires*, and therefore void — as in *Thomas* v. *Railroad Co.*, 101 U. S. 71, and in *Central Transportation Co.* v. *Pullman's Car Co.*, 139 U. S. 24, and 171 U. S. 138.

Questions of public policy, as affecting the liability for acts done, or upon contracts made and to be performed, within one of the States of the Union — when not controlled by the Constitution, laws or treaties of the United States, or by the principles of the commercial or mercantile law or of general jurisprudence, of national or universal application — are governed by the law of the State, as expressed in its own constitution and statutes, or declared by its highest court. *Elmendorf* v. *Taylor*, 10 Wheat. 152, 159; *Bank of Augusta* v. *Earle*, 13 Pet. 519, 594; *Vidal* v. *Girard*, 2 How. 127, 197; *Bucher* v. *Cheshire Railroad*, 125 U. S. 555, 581, 584; *Detroit* v. *Osborne*, 135 U. S. 492, 498, 499; *Union Bank* v. *Kansas City Bank*, 136 U. S. 223, 235; *Etheridge* v. *Sperry*, 139 U. S. 266, 276, 277; *Gardner* v. *Michigan Central Railroad*, 150 U. S. 349, 357; *Bamberger* v. *Schoolfield*, 160 U. S. 149, 159; *Missouri &c. Trust Co.* v. *Krumseig*, 172 U. S. 351; *Sioux City Railroad* v. *Trust Co. of North America*, 173 U. S. 99.

The validity of the agreement now in controversy does not depend upon the Constitution, laws or treaties of the United States, or upon any principle of the commercial or mercantile law, or of general jurisprudence.

Generally speaking, the right of a railroad corporation to build its road, and to run its locomotive engines and cars thereon, within any State, is derived from the legislature of

the State; and it is within the undisputed powers of that legislature to prescribe the precautions that the corporation shall take to guard against injuries to the property of others by the running of its trains; as well as the measure of its liability in case such injuries happen. Among the most familiar instances of the exercise of this power are statutes requiring a railroad corporation to erect fences between its road and adjoining lands, and subjecting it to either single or double damages for any injury to cattle or other animals caused by its neglect to do so; *Missouri Pacific Railway* v. *Humes*, 115 U. S. 512; *Minneapolis & St. Louis Railway* v. *Beckwith*, 129 U. S. 26; *Same* v. *Emmons*, 149 U. S. 364; and statutes making a railroad corporation liable, for damages to property of others from fire set by sparks from its locomotive engines, either independently of negligence on its part, or in case of such negligence only. *St. Louis & San Francisco Railway* v. *Matthews*, 165 U. S. 1; *Atchison &c. Railroad* v. *Matthews*, 174 U. S. 96.

As was well said by the Circuit Court, in the case at bar, in a passage quoted by this court in *St. Louis & San Francisco Railway* v. *Matthews*, just cited: "The right to use the agencies of fire and steam in the movement of railway trains in Iowa is derived from the legislation of the State; and it certainly cannot be denied that it is for the State to determine what safeguards must be used to prevent the escape of fire, and to define the extent of the liability for fires resulting from the operations of trains by means of steam locomotives. This is a matter within state control. The legislation of the State determines the width of the right of way used by the companies. The State may require the companies to keep the right of way free from combustible material. It may require the depot and other buildings used by the company to be of stone, brick or other like material, when built in cities, or in close proximity to other buildings. The State, by legislation, may establish the extent of the liability of railway companies for damages resulting from fires caused in the operation of the roads." 62 Fed. Rep. 907; 165 U. S. 17.

The statutes and decisions of the State of Iowa, so far as

they have been brought to our notice, that throw any light upon the present case, are the following :

In *Richmond* v. *Dubuque & Sioux City Railroad*, (1868) 26 Iowa, 191, the railroad company leased a piece of ground at its eastern terminus on the bank of the Mississippi River to an elevator company ; and it was agreed between them that the elevator company should maintain an elevator building thereon, and should receive and discharge for the railroad company at certain rates, all grain brought over the railroad, shipped primarily to points beyond or other than Dubuque, and should have the handling of all such grain ; and that the railroad company, during the lease, would not itself erect, or lease or grant to any other party the right to erect, a similar building in Dubuque. The railroad company, being sued on the agreement, contended that it was in contravention of sound public policy, as giving to the elevator company a monopoly of all the through grain brought over the railroad. But the Supreme Court of Iowa held the agreement to be valid, and, in the course of its opinion, said: "The elevator is mainly a means or instrumentality for loading and unloading grain into and out of cars, boats, barges or other vehicles, and, incidentally, for storing the same; it is in no just sense a connecting line of transit or connecting common carrier to the defendants' lines." 26 Iowa, 197. "The power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt." 26 Iowa, 202.

The statute of Iowa of 1862, c. 169, § 6, (substantially reënacted in the code of 1873, § 1289,) provided that "any railroad company hereafter running or operating its road in this State, and failing to fence such roads on either or both sides thereof, against live stock running at large, at all points where said roads have the right to fence, shall be absolutely liable to the owner of any live stock injured, killed or destroyed by reason of the want of such fence or fences as aforesaid, for the value of the property so injured, killed or destroyed unless the injury complained of is occasioned by the wilful act of the

owner or his agent;" that, "in order to recover, it shall only be necessary for the owner of the property to prove the injury or destruction complained of;" and that, if the company should neglect to pay for thirty days after notice and affidavit, the owner might recover double damages. Under that statute it was held to be no defence that the stock was unlawfully running at large, if not by the wilful act of the owner or his agent. *Spence* v. *Chicago & Northwestern Railway*, (1868) 25 Iowa, 139. But where the owner of land had agreed to maintain a fence between it and the railroad, the court, while holding that persons not in privity of estate with him might still recover, said that it could not be doubted that he and his privies were estopped by his agreement to maintain an action against the company under that statute. *Warren* v. *Keokuk & Des Moines Railroad*, (1875) 41 Iowa, 484, 486.

Upon the question of the liability of a railroad corporation for damage done to the property of others by fire from its locomotive engines, in the absence of any contract between the parties, the course of legislation and decision in Iowa was as follows: Before any statute upon the subject, the corporation was held not to be liable, without proof of negligence on its part, or if the plaintiff's own negligence contributed to the loss. *Kesee* v. *Chicago & Northwestern Railroad*, (1870) 30 Iowa, 78; *Gandy* v. *Same*, (1870) 30 Iowa, 420; *McCummons* v. *Same*, (1871) 33 Iowa, 187; *Garrett* v. *Same*, (1872) 36 Iowa, 121. Thereupon the legislature amended the section above cited by adding a provision that "any corporation operating a railway shall be liable for all damages by fire that is set out or caused by operating of any such railway; and such damage may be recovered by the party damaged, in the same manner as set forth in this section in regard to stock, except to double damages." Code of 1873, § 1289. This amendment was at first assumed to impose an absolute liability upon the corporation, independently of its negligence, and was held to be constitutional. *Rodemacher* v. *Milwaukee & St. Paul Railway*, (1875) 41 Iowa, 297. But it was afterwards settled, upon a consideration of the whole section, that the effect of the amendment was only to change the burden of proof in actions

for damages by fire; that the fact that the fire was set out or caused by operating the railway was only *prima facie* evidence of negligence on the part of the company; and that such negligence need not be alleged. *Small* v. *Chicago, Rock Island & Pacific Railroad,* (1879) 50 Iowa, 338; *Babcock* v. *Chicago & Northwestern Railway,* (1883) 62 Iowa, 593; *Seska* v. *Chicago, Milwaukee & St. Paul Railway,* (1889) 77 Iowa, 137; *Engle* v. *Same,* (1889) 77 Iowa, 661. It was also held that, by virtue of the statute, contributory negligence on the part of the plaintiff was no defence to such an action. *West* v. *Chicago & Northwestern Railway,* (1889) 77 Iowa, 654; *Engle's case,* just cited.

The Code of Iowa of 1873, in § 1308, reënacting the statute of Iowa in 1867, c. 113, provided that "no contract, receipt, rule or regulation shall exempt any corporation, engaged in transporting persons or property, by railway, from liability of a common carrier, or carrier of passengers, which would exist had no contract, receipt, rule or regulation been made or entered into." That statute was rigidly enforced by the Supreme Court of Iowa in suits against railroad corporations as carriers. *Brush* v. *Sabula &c. Railroad,* (1876) 43 Iowa, 554; *McCoy* v. *Keokuk & Des Moines Railroad,* (1876) 44 Iowa, 424. But no intimation that it applied to them in any other relation was ever made by that court before the execution of the agreement in question in the case at bar.

To recapitulate: Before February 1, 1890, the date of this agreement, the Supreme Court of Iowa had declared that an elevator erected by another party by agreement with a railroad company upon the land of the latter was in no just sense a connecting line of transit, or a connecting common carrier, with the line of the railroad; and that the power of the courts to declare a contract void for being in contravention of public policy should be exercised only in cases free from doubt. That court, in 1875, when construing section 1289 of the Code of 1873, had declared that an action under the first part of that section, which makes a railroad corporation, failing to fence its road wherever it had a right to do so, absolutely liable to an action by the owner of any live stock killed or injured by

the want of such fencing, could not be maintained by an owner of adjoining land who had agreed with the railroad company to maintain the fence at the place in question. And that court had never expressed any opinion upon the effect of such an agreement as is now pleaded upon an action against a railroad company, under the latter part of that section, for damages by fire caused by the negligence of its servants in operating its railway.

After this agreement was made, and before this action was begun, a similar agreement was brought before the courts of the State of Iowa, in the case of *Griswold* v. *Illinois Central Railroad*, which arose under a contract substantially similar to that now before us, except in containing covenants by the lessee to put in immediate use and to maintain a good and substantial elevator, coal sheds and lumber yard on the premises; to ship all grain, coal and lumber that he can control by the lessor's railroad; and to "transact the business for which said buildings are erected and designed at fair and reasonable rates, and in a prompt and careful manner, so that neither the company nor the public will be prejudiced by reason of the said lessee dealing unfairly or negligently in their behalf, or in the transaction of the business connected with the grain, coal and lumber buildings so erected as aforesaid." A district court of the State having upheld the validity of the contract, and rendered judgment for the defendant, the plaintiff appealed to the Supreme Court of the State.

That court, at the first hearing, expressed an opinion that the stipulation in the contract, exempting the railroad company from liability to the lessee for damages by fire negligently set by its locomotive engines to such buildings, was void as against public policy; and among the grounds on which that opinion was placed were that the covenants just quoted, and the prospect for business which the existence and use of those buildings held out to the railroad company, "were no doubt the controlling consideration which induced it to execute the lease," and that "the lease itself fully recognizes an interest of the public in its subject-matter." 53 Northwestern Reporter, 295, 297. It does not clearly appear what that opin-

ion would have been, but for those covenants, no equivalent for which is to be found in the lease now before us.

But that court granted a rehearing, and on February 3, 1894, after further arguments, and, by a majority of the judges, reversed its former opinion, affirmed the judgment of the district court, and held the stipulation in question to be valid. 90 Iowa, 265. Its course of reasoning may be shown by quoting some passages of the opinion.

In the first place, it was said : " Public policy is variable — the very reverse of that which is the policy of the public at one time may become public policy at another; hence no fixed rule can be given by which to determine what is public policy. The authorities all agree that a contract is not void as against public policy, unless it is injurious to the interests of the public, or contravenes some established interest of society." So far, the opinion is in precise accord with the opinion of this court in *Pope Manufacturing Co.* v. *Gormully*, 144 U. S. 224, 233. The Iowa court then quoted with approval the saying of Sir George Jessel, M. R., in *Printing Co.* v. *Sampson*, L. R. 19 Eq. 462, 465 : "It must not be forgotten that you are not to extend arbitrarily those rules which say that a given contract is void as being against public policy, because, if there is one thing more than another which public policy requires, it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into fairly and voluntarily, shall be held sacred, and shall be enforced by courts of justice. Therefore, you have this paramount public policy to consider — that you are not lightly to interfere with this freedom of contract."

The court went on to say : " The defendant owed no duty to the public to exercise care with respect to its own buildings situate on its right of way, and incurred no liability for their negligent burning, unless the fire spread beyond its own premises. The operation of a railway increases the danger from fire to property situated on the premises of its owner, where he has the right to have it, and hence the provision of section 1289 making the corporation operating the railway

absolutely liable for all damages by fire that is negligently set out or caused by the operation of the railway. As to such property, the railway company owes to the public the duty of care, and the public has an interest in the performance of that duty. Therefore a contract that exempts from that duty to the public would be injurious to the public interests, and against public policy. The plaintiff Griswold's buildings were not upon his own premises, nor where he had a right to have them, independent of the defendant; they were upon the right of way, where they could only be by its permission. In granting the permission, and in placing the buildings there, both parties knew of the increased hazard of the location from fire communicated either through accident or negligence in the operation of the road. They knew that the defendant corporation could only act through its officers, agents and employés, and that these might be negligent in the performance of their duties." " This is not a question whether, under section 1289, the defendant would be liable to Griswold for negligently communicating fire to this property in the absence of a contract to the contrary; but it is whether the public has any interest that this contract contravenes. It seems to us now quite clear that, as these buildings could only be placed upon the defendant's right of way by its consent, and were so placed upon the premises, and on the conditions expressed in the lease, the public had no interest therein, under said section 1289 or otherwise, that would be injured by giving effect to the agreement in question. Much as the public may have been interested in the convenience of such a place of business, it had no interest as to who should carry the hazard incident to that property being located as it was." " Upon further consideration we are of the opinion that this contract was not made by the defendant in its capacity as a common carrier, and that the provision of section 1308 is not applicable." " After a careful review of the case, we reach the conclusion that the public had no interest in the clause of the contract in question, that its enforcement works no injury to any interest of the public, and that the judgment of the district court should be affirmed."

A second petition for rehearing was then filed, and that case had not been finally decided by the Supreme Court of Iowa when the present case came before the Circuit Court of the United States at April term 1894. The Circuit Court thereupon suspended judgment in this case; and at September term 1894 — the state court having meanwhile denied the second petition for a rehearing, and thereby finally affirmed the validity of the stipulation — followed the final decision of that court, and gave judgment for the defendant. 62 Fed. Rep. 904.

The first opinion of the Supreme Court of the State of Iowa in the case of *Griswold* v. *Illinois Central Railroad* was delivered after the agreement now in question was made. The final decision in that case, reversing the former opinion, was made after repeated arguments and full consideration; was nowise inconsistent, to say the least, with the decision or the opinion of that court in any other case; and was rendered before the case at bar was decided in the Circuit Court of the United States. Under such circumstances, that decision, being upon a question of statutory and local law, was rightly followed by the Circuit Court. *Rowan* v. *Runnels*, 5 How. 134, 139; *Morgan* v. *Curtenius*, 20 How. 1; *Fairfield* v. *Gallatin County*, 100 U. S. 47, 52; *Burgess* v. *Seligman*, 107 U. S. 20, 35; *Bauserman* v. *Blunt*, 147 U. S. 647, 653–656, and cases there cited; *Williams* v. *Eggleston*, 170 U. S. 304, 311; *Sioux City Railroad* v. *Trust Company of North America*, 173 U. S. 99; *Wade* v. *Travis County*, 174 U. S. 499.

*The judgment of the Circuit Court of Appeals, affirming the judgment of the Circuit Court, is therefore affirmed.*