## SIOUX CITY, IOWA, v. MISSOURI VALLEY PIPE LINE CO. et al.

No. 298.

District Court, N. D. Iowa, W. D.

Feb. 3, 1931.

R. A. Oliver and A. O. Jepson, both of Sioux City, Iowa, for plaintiff.

Emmet Tinley, of Council Bluffs, Iowa, Robert B. Pike, of Sioux City, Iowa, George A. Lee, of Lincoln, Neb., and Edwin D. Mitchell, of Council Bluffs, Iowa, for defendant Missouri Valley Pipe Line Co.

C. N. Jepson, Guy T. Struble, and Byron L. Sifford, all of Sioux City, Iowa, for defendant Sioux City Bridge Co.

C. N. Jepson, Guy T. Struble, and Byron L. Sifford, all of Sioux City, Iowa, for defendants Chicago, St. P., M. & O. Ry. Co. and Chicago & N. W. Ry. Co.

Larned F. Brown, of Sioux City, Iowa, for defendant Haakinson & Beaty Co.

David W. Stewart and Rex H. Hatfield, both of Sioux City, Iowa, for defendant Armour & Co.

Harry S. Snyder and John S. Sears, both of Sioux City, Iowa, for defendant Cudahy Packing Co.

SCOTT, District Judge.

This is a suit brought by the city of Sioux City, Iowa, against Missouri Valley Pipe Line Company of Iowa, a corporation, and six other defendants in the district court of Iowa for Woodbury county, and thereafter within the time prescribed by the removal acts, by the Missouri Valley Pipe Line Company removed to the District Court of the United States for the Northern District of Iowa, upon the ground of separable controversy. The city of Sioux City, Iowa, will be hereinafter referred to as the city. The Missouri Valley Pipe Line Company of Iowa will hereinafter be referred to as the pipe line company; the Sioux City Bridge Company, as the bridge company; the defendant Chicago, St. Paul, Minneapolis & Omaha Railway Company, as the Omaha Company; the defendant Chicago & Northwestern Railway Company, as the Northwestern Company; and the other defendants by their respective names.

The primary object of the suit is to enjoin the pipe line company from piping natural gas from the present terminus of its pipe line in Nebraska, immediately across the Missouri river from Sioux City, into the city of Sioux City, and selling the same to the defendants Armour & Company and the Cudahy Packing Company, for consumption at their packing plants in Sioux City. It is also alleged in the bill that the pipe line company intends to sell natural gas to the citizens of Sioux City. The bridge company is alleged to be the owner of a bridge across the Missouri river with approaches and right of way incident to such bridge, and that the pipe line company intends to lay its pipe line across said bridge and over the approaches and right of way incident thereto, from the state of Nebraska into Sioux City and to the plants of Armour & Company and the Cudahy Packing Company, and to cross certain streets of the city in so doing, and all without a franchise from the city of Sioux City as required by the laws of Iowa. The Northwestern Company and the Omaha Company are alleged to be the owners of certain railway tracks adjacent to the packing houses, but it is not certainly alleged that the pipe line company expects to use said tracks or right of way upon which they are laid. The Omaha Company is alleged to be interested in the stock and ownership of the bridge company. And the defendant Haakinson & Beaty Company is alleged to be the contractor which the pipe line company expects to employ in the construction of its pipe line into the city. Armour & Company, and the Cudahy Packing Company are alleged to be meat packers with contracts from the pipe line company to use natural gas when brought into the city and delivered as aforesaid. The city filed a motion to remand the case upon the ground that certain of the defendants were citizens of the state of Iowa. On presentation of the motion to remand, inspection of the plaintiff's bill disclosed that the primary and ultimate object of the bill

challenged the right of the pipe line company to pipe natural gas into Sioux City and deliver the same to Armour & Company and the Cudahy Packing Company for consumption at their plants without a franchise from the city; and also challenged the right of the pipe line company to pass over and use certain streets of the city in reaching the packing plants without such franchise. The court concluded that these controversies were between the city and the pipe line company, and could be completely litigated as between them without the presence of any of the other parties defendant on the record. That neither the presence of the contractor, who it is alleged intended to aid in the laying of the pipe, nor the owners of the bridge company and of the right of way expected to be used, nor the railway companies interested in the bridge company, nor the packing companies themselves were necessary parties to the litigation of these particular rights. The motion was therefore overruled.

The pipe line company answered the plaintiff's bill admitting that it was the owner of a pipe line extending from the oil fields of Texas into and through Nebraska, and terminating at a point in Nebraska near the western approach to the Sioux City Bridge Company's bridge; that it had entered into contracts with Armour & Company and the Cudahy Packing Company to furnish their plants with natural gas for fuel purposes to the extent of approximately four million cubic feet of natural gas per day; that it purposed to construct a pipe line from its present terminus across the Sioux City Bridge Company's bridge and its approaches and right of way to the plants of Armour & Company and the Cudahy Packing Company, and deliver gas to such packers in fulfillment of its contracts for consumption by the packers when delivered at their plants. It admits that it has no franchise from the city. The pipe line company denies that it purposes or expects to sell to and furnish the citizens of Sioux City generally natural gas, except to Armour & Company and the Cudahy Packing Company with whom it has the contracts stated. It denies that it purposes or intends to cross or use any street or alley of the city in piping its gas from Nebraska to the plants of Armour & Company and the Cudahy Packing Company in Sioux City. It alleges that its only purpose is to bring natural gas from the state of Nebraska into Sioux City and deliver the same to Armour & Company and the Cudahy Packing Company in interstate commerce, and to use only as right of way the bridge and approach

track right of way of the bridge company in reaching the plants of Armour & Company and the Cudahy Packing Company; that such bridge was built under the authority of an act of Congress of the United States and as an interstate bridge, over the use and operation of which the city of Sioux City has no jurisdiction and alleges that it cannot lawfully be required to take a franchise from the city.

Answers were filed by the other defendants substantially the same as by the pipe line company so far as applicable, and the pipe line company, as well as the two railroads, the two packers, and the bridge company, moved to dissolve an injunction granted by the state court before the filing of the petition for removal by the pipe line company. The motions having been assigned and all parties having answered the plaintiff's bill, the motions were heard upon the bill and answers, certain stipulations, and oral and documentary evidence adduced. Evidence upon all questions involved having been introduced, and the motions and the cause fully argued, the motions and the case by agreement of parties were fully submitted.

Upon the submission of the cause it was apparent, and was so conceded by all parties in argument, that the case had been narrowed to two controversial matters: First, whether the pipe line, which the pipe line company proposed to lay from the bridge company's bridge to the Armour and Cudahy plants, would cross through the limits of any public street of the city; and, second, whether the proposed delivery of natural gas by the pipe line company to Armour & Company and the Cudahy Packing Company at their respective plants could be lawfully consummated without a franchise from the city.

Respecting the first question the city contends that the route of the proposed pipe line will pass over and through the limits of a public street of the city (which for convenience I shall call Warrington Road extended), and therefore a franchise from the city is required. The pipe line company, on the contrary, contends that its proposed pipe line route does not pass over or through the limits of any public street, and therefore that no franchise is required. The pipe line company seeks to support its contention upon two hypotheses: (a) That a certain subway through the right of way of the bridge company and under its roadbed and tracks is not a public street; and (b) that conceding such subway to be a part of the public street,

such public street is limited to the subway and does not include the viaduct over such subway which forms the roadbed and bears the tracks of the bridge company.

Respecting the second question the city contends that the sale of natural gas to any consumer within the city limits is subject to municipal regulation under the laws of the state of Iowa, and requires a franchise from the city. On the contrary, the pipe line company contends that its transportation of natural gas from the state of Nebraska through its proposed pipe line to the plants of Armour & Company and the Cudahy Packing Company, and the sale of such gas to said companies is a single and indivisible act of interstate commerce, and that to require the pipe line company to take a franchise and submit to municipal regulation would be a direct burden upon interstate commerce and unlawful.

I shall now proceed to examine these two controlling questions in their order stated, and to state and find the facts deemed material to their solution. First, will the proposed pipe line, if laid on the route and in the manner proposed, invade the limits of any public street within the city so as to bring it within the scope of the regulating power of the municipality and require a franchise?

The following facts I find to be without dispute in the record:

1. That the city of Sioux City is a municipal corporation, organized under the laws of the state of Iowa, and for jurisdictional purposes a citizen of that state.

2. That the Missouri Valley Pipe Line Company of Iowa is a corporation organized under the laws of the state of Delaware, and a citizen of that state.

3. That the Chicago & Northwestern Railway Company and Chicago, St. Paul, Minneapolis & Omaha Railway Company are corporations organized under the laws of the state of Illinois and Wisconsin, respectively, and citizens of those states.

4. That the Sioux City Bridge Company is a corporation organized under the laws of the state of Iowa, and a citizen of that state.

5. That Haakinson & Beaty Company is a corporation organized under the laws of Iowa, and a citizen of that state.

6. That the Cudahy Packing Company is a corporation organized under the laws of the state of Maine, and a citizen of that state.

7. That Armour & Company is a corporation organized under the laws of the state of Illinois, and a citizen of that state.

8. That the Missouri Valley Pipe Line Company of Iowa is the owner and operator of a gas pipe line from the gas fields in the state of Texas through that state and through Oklahoma, Kansas, and Nebraska, and to a point in Nebraska almost immediately across the Missouri river from the city of Sioux City.

9. That Armour & Company and the Cudahy Packing Company have large packing houses located in Sioux City upon plots of ground adjoining each other and not separated by any public street, alley or ground of the city.

10. That the pipe line company has contracts or arrangements with Armour & Company and the Cudahy Packing Company for the furnishing of natural gas at their respective plants for use and consumption therein in the estimated aggregate amount of a billion and a half cubic feet per year. That the pipe line company proposes and intends to extend its pipe line from its present terminus in the state of Nebraska to the Armour and Cudahy plants in the city, and in doing so to lay its pipe line across the Missouri river on the bridge of the bridge company and its approaches and right of way into the Armour & Company plant, and thence to the Cudahy plant.

11. That the bridge company acquired its right of way from the eastern terminus of its present bridge across the Missouri river to the Armour and Cudahy plants by grant from Addison Cochran in June, 1887, patentee from the United States.

12. That by Act of Congress approved August 15, 1876, found in 19 Statutes at Large, page 205, the Sioux City Bridge Company was authorized to construct, under the conditions and limitations therein provided, a bridge across the Missouri river at or near Sioux City, Iowa, and lay on and over said bridge railway tracks. That in pursuance of said authorization the bridge company constructed a railway bridge across the Missouri river at a point near the south line of section 34, township 89, range 47, and constructed approaches, the easterly approach extending from the east end of the bridge easterly and on a curve to the north to a point adjacent to the Armour and Cudahy plants.

13. That the grant to the bridge company of its right of way was by its terms subject to the right of way of the Sioux City & Pacific Railroad Company which crosses the right of way of the Sioux City Bridge Company and is now owned by the Northwestern Company; and also subject to the public

highway located through said land. The only highway located through such right of way at that time was a county road known as the Sergeant Bluff's Road. Its location as shown by the record was uncertain, there being no specific survey. However, the evidence without dispute shows that on November 12, 1872, the board of supervisors of Woodbury county ordered the laying out of the Sioux City-Sergeant Bluff's Road, and that in February, 1873, a resolution was passed establishing said road and naming it Road 77. That said road intersected the right of way of the bridge company a few hundred feet from the easterly end of the bridge. That at the easterly end of the bridge company's bridge were precipitous bluffs arising above the Missouri river and the Floyd river, which entered the Missouri river just north of that point, approximately two hundred feet. That the roadbed of the bridge company's easterly approach to the bridge was cut through this bluff for a distance of approximately a quarter of a mile, and dropped down as it curved northerly and emerged into the Floyd river bottom upon a high grade or embankment, and thence gradually descended to the level of the river bottom near the Armour and Cudahy plants. That the Sergeant Bluff's Road was carried over the track and roadbed of the bridge company upon a high pile bridge, and cut of the Sergeant Bluff's Road not being as deep as the cut of the bridge company.

14. That the Sioux City Stockyards is located immediately north of the right of way of the bridge company as it proceeds easterly from the east end of the bridge, and its lands extend to such right of way. That with the development of the stockyards district, additions were laid out south and easterly of this right of way, streets were improved, and the Sergeant Bluff's Road became little traveled, and was on July 12, 1913, vacated by an ordinance of the city. That the shelving or sloping portion of the bluff lying northerly from the bridge-company's right of way was graded down for stockyards purposes.

15. In the year 1903, the Sioux City Stockyards Company deeded a strip of land to the city for a new channel for the Floyd river, and that river was straightened so as to flow past the westerly side of the Cudahy and Armour plants and southwesterly into the Missouri river a short distance north of the east end of the bridge company's bridge. That between this new channel and the Armour plant, which lies southerly from the Cudahy plant, was a strip of land belonging to Armour & Company, and south of that a large tract of land owned by the Sioux City Stockyards Company, and also immediately adjoining the Armour plant and running southerly curving to the east, a right of way of the Sioux City Traction Company for its street car tracks. That at that time access from the southeastern part of the city to the packing plants to the stockyards company was hampered by the grade of the Sioux City Bridge Company; there being no crossings through or over the same at a convenient point; and the street car line of the traction company necessarily terminated when it reached the right of way of the bridge company.

16. That on August 30, 1904, the bridge company, the stockyards company, and the traction company entered into a contract contemplating the opening of a way and grading of a subway through the bridge company's right of way and under its tracks at a point near where the tracks emerged from the bluffs and came down on the bottom. Said contract provides and recites:

"Whereas, said Traction Company owns and operates a line of electric railway in Sioux City, Iowa, and has applied to the Bridge Company for the right to lay down and operate a line of electric railway across the right of way of the Bridge Company at the place hereinafter described, in a subway to be constructed beneath the railroad tracks of the Bridge Company, and the said Stockyards Company is engaged, among other things, in the business of conducting stockyards at Sioux City, and such place of crossing and sub-way will be adaptable as a route or way for the passage of persons, vehicles and livestock to and from such stockyards, and in connection with the conduct thereof, as well as a route of travel for the public, and said Stock Yards Company has applied for the right to use said crossing and subway as a route or way for the persons, vehicles and live-stock to and from its stockyards and in connection with the business thereof.

"Now, therefore, the said Bridge Company, for and in consideration of the covenants and agreements of the said parties of the second part herein contained, hath granted, and by these presents doth grant unto said Traction Company upon the conditions and for the purposes hereinafter set forth, the right to lay down, maintain and operate a single or double line of electric railway over and across the right of way of said Bridge Company, in the subway to be constructed beneath the railroad tracks of said Bridge

Company at a point so that the center line of such subway measured from north to south under the present main track of said Bridge Company will be about sixteen (16 ft.) north of the north line of Block Twelve (12) of the West Morning Side Addition to Sioux City if produced westerly across the tracks of said Bridge Company—the location of which said crossing and subway is indicated upon the blue-print map hereto attached, Marked "A," and made a part hereof—and the said Bridge Company hath granted, and by these presents doth grant, unto said Stockyards Company, upon the condition hereinafter set forth, the right to use the said place of crossing and subway for the passage of persons, vehicles and livestock to and from the yards of said Stockyards Company and in connection with the business thereof.

"The foregoing grants are expressly conditioned upon the performance by said parties of the second part of all and singular the covenants and agreements hereinafter set forth to be by them kept and performed, and a default in or a failure to perform any of said covenants or agreements shall work an absolute forfeiture of said grants. * * * "

Said contract also provides for the construction of a permanent viaduct over the subway for the roadbed and tracks of the bridge company, and for indemnity under numerous contingencies; and also contains the following provisions:

"7. If at any time hereafter said place of crossing shall become or be used as public street or highway, the said parties of the second part will, at their own cost and expense, promptly furnish all materials and perform all work and labor necessary to put and maintain the same in such condition and repair as may be required by the laws of the State, or by any ordinance, by-law, regulations or requirements of the city; and will bear and pay all taxes, assessments and charges levied or made against the said Bridge Company, its lessees or licensees, or the property of either, on account of the opening, construction, maintenance, improvement or repair of such crossing and sub-way, and will indemnify and save harmless the said Bridge Company, its lessees and licensees, from any and all loss or damage on account or injury to the property of said Bridge Company, its lessees and licensees, and from and against any and all claims, demands, actions or causes of action, for or on account of injury to the property to any person, or injury to or death of any person caused or occasioned in whole or in part by any condition of said crossing subway."

17. After the execution of the foregoing contract the parties of the second part thereto caused to be graded down the bluff or hill at the point where the crossing was to be, put in temporary structures to support the tracks of the Bridge Company, and cut away the bluff under the tracks to a depth of about twenty feet, put in two massive reinforced concrete piers or abutments sixty-six feet apart, entirely crossing the right of way of the bridge company, and caused to be constructed and resting thereon and completely spanning the opening below, two permanent steel bridges or viaducts, one for each of the tracks of the bridge company, the bottom of the girders of said bridge being about eighteen feet above the grade of the subway. On the north side of this opening or subway the traction company laid its two lines of track. South of these lines of track, there being still a space of about half the width of the subway which was thereafter used by the stockyards company and those of the public having occasion to pass through to the stockyards company's plant, as well as to the plants of Armour and Cudahy, and northward to a connection with Chambers street, a permanent street of the city.

18. In August, 1903, Armour & Company deeded to the city a strip of land opposite its plant and between the Sioux City Traction Company's right of way and the new bed of the Floyd river, and the traction company deeded to the city a strip of land on the southerly side of its right of way connecting with the strip deeded by Armour & Company on the north, and continuing along the right of way of the traction company to the line of the bridge company's right of way at a point where the subway was located. This placed title in the city to a strip of land sufficient to constitute a road or driveway from the westerly entrance to Armour & Company's plant and from a certain bridge crossing the new channel of the Floyd river parallel with the right of way of the traction company to the point where the subway crossed the right of way of the bridge company. From that time forward the public, and particularly those having business at the stockyards and the packing houses, at least to some extent used this roadway and the subway under the bridge company's tracks and beyond over ground the title to which does not clearly appear in the record, to a connection with certain streets of the city.

19. About the year 1921, the city by the usual proceeding ordered this roadway paved from the bridge crossing the Floyd river near the westerly entrance of Armour & Compa-

ny's plant to and through the subway and to a connection with certain streets; and since that time the public has generally used such pavement as a roadway or street. And I find that the records show without controversy that at the time said pavement was put in through the subway there was no other street or alley or other public or private way crossing the right of way of the bridge company between the eastern end of the bridge and Armour & Company's plant, with the exception of the railroad right of way of the Northwestern Company, which intersects the right of way of the bridge company immediately under the east end of the bridge and close to the Missouri river bank. The Northwestern right of way, however, affords no means for public travel, nor has there since been any other street or crossing.

20. No grant or conveyance of any kind was ever made by the bridge company to the city for the use of the viaduct, and I find that the right of the city to use the subway as a street rests upon and is referable to the contract between the bridge company and the traction company and the stockyards company, and the implied common consent of all parties to the contract thereafter to the use of said subway by the city. I further find no consent by any party to said contract to the use by the city or the public of any space crossing the bridge company's right of way, except through said subway and below the bottom girders of the bridges forming the roadbed and bearing the tracks of the bridge company, and that the right of the city for road or street purposes is confined to the subway below the lower edges of the girders of said bridges and between the southerly pier or abutment and the southerly line of the traction company's right of way, which space is now paved.

I think the foregoing ultimate facts found embody all facts necessary to a determination of the controversies involved in this suit. Any further fact found to be material will be stated and found in the course of further discussion.

The question now occurs: Is the conclusion that the rights of the city are confined to the space covered by its pavement and below the bottom of the girders of the permanent bridges forming the roadbed of the bridge company and bearing its tracks, legally justified? The bridge of the bridge company with its approaches constitute an important interstate highway, authorized and constructed pursuant to and in conformity with an act of Congress. Mr. Chief Justice Fuller, in speaking for the Supreme Court in Union Pacific Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 585, 16 S. Ct. 1173, 1181, 41 L. Ed. 265, said in a situation very much the same as in the instant case: "At South Omaha are stockyards and packing industries of great extent, furnishing the companies a vast volume of freight, and compelling the building of many tracks. If it were true that railroad companies could not, ordinarily, without the aid of a statute, grant running facilities over their tracks, even when such an arrangement would not interfere with their business, the application of so rigorous a rule to defeat a contract, as between the parties, in respect of tracks in the congested parts of large cities, where the entire use of them is not required by their owners, does not seem reasonable." This language is also pertinent to the right of the bridge company to grant leave to the pipe line company to lay its pipe line over the bridge and upon the approaches to the bridge, for the approaches are an essential part of the bridge as appears from the further expression of the Chief Justice in the case just cited at page 588 of 163 U. S., 16 S. Ct. 1173, 1182, and in the following language: "A railroad bridge can be of no use to the public unless united with necessary appurtenances, such as approaches, tracks, depots, and other facilities for the public accommodation. And we consider Council Bluffs, Omaha, and South Omaha, under the facts, as necessarily embraced in the intention of congress." Here it would seem that the authority to bridge the Missouri river with necessary approaches, embodied trackage over many miles. I think that no interference with the grant and privileges to the bridge company by Congress should be implied beyond the actual necessities of the case, and this is particularly true in view of the fact that the rights of the city to use the subway rest upon no specific grant but upon an implied consent and user. And certainly there is no occasion to imply or assume any consent upon the part of the bridge company to the use or dominion of its right of way above the girders of the bridges across the subway and forming the bridge company's roadbed. Such being the case, we next inquire: May the bridge company grant the right to the pipe line company, it not being a railroad, to lay its pipe line over the bridge and along its right of way to the Armour and Cudahy plants? In this connection the language of Mr. Justice Gray, speaking for the Supreme Court in Hartford F.

Ins. Co. v. Chicago, etc., Railway, 175 U. S. 91, at page 99, 20 S. Ct. 33, 36, 44 L. Ed. 84, is applicable:

"A railroad corporation holds its station grounds, railroad tracks, and right of way for the public use for which it is incorporated, yet as its private property, and to be occupied by itself or by others in the manner which it may consider best fitted to promote, *or not to interfere with*, the public use." (The italics are mine.)

Again, the language of Circuit Judge Sanborn in Northern Pac. Ry. Co. v. North American Tel. Co. (C. C. A.) 230 F. 347, 349, L. R. A. 1916E, 572:

"A railway company, which has become the owner of a railroad which it is operating and of a right of way appurtenant thereto, has the exclusive right to the use of that right of way for telegraph purposes as well as for railroad purposes. If after the application of so much of the use thereof as the maintenance of its own railroad and telegraph requires there remains a surplus use of that right of way either for telegraph purposes or for railroad purposes, it may lease or permit that use, or any part of it, for a valuable consideration for any purpose which does not interfere with its operation of its own railroad and telegraph and its discharge of its duties to the public so to operate them. This right of a railroad company to lease or permit the surplus use of its right of way, or of its property, is its private property and it is often very valuable property. Union Pac. Ry. Co. v. Chicago, R. I. & P. Ry. Co. 51 F. 309, 315, 317, 321, 2 C. C. A. 174; Union Pac. Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 585, 16 S. Ct. 1173, 41 L. Ed. 265; American Telephone & Telegraph Co. v. St. Louis, I. M. & Southern Ry. Co., 202 Mo. 656, 101 S. W. 576, 585, 586; Hartford Fire Ins. Co. v. Chicago, etc., Ry. Co., 175 U. S. 91, 93, 20 S. Ct. 33, 44 L. Ed. 84; James Quirk Milling Co. v. Minneapolis & St. Louis R. R. Co., 98 Minn. 22, 26, 107 N. W. 742, 116 Am. St. Rep. 336; Western Union Telegraph Co. v. Penn. R. R. Co., 195 U. S. 540, 570, 25 S. Ct. 133, 141, 49 L. Ed. 312, 1 Ann. Cas. 517."

I therefore conclude as a matter of law that the bridge company may lease or permit the use of its right of way to the pipe line company for the laying of its natural gas pipe, it appearing that such use will in no degree interfere with the use of the bridge, its approaches or appurtenances for the purposes of the bridge company.

I further conclude as a matter of law that the city has no dominion or right of interference of the use of the right of way of the bridge company, except at and through the subway hereinbefore referred to, and then only as to the space between the right of way of the traction company and the southerly pier or abutment of the viaduct over said subway and below the bottom of the girders of the bridges over said subway.

Therefore, it appearing that the pipe line company in its proposed laying of its pipe line will not invade the limits of any street, alley, or ground of the city, nor affect nor interfere with the same, I conclude as a matter of law that no franchise from the city or action by the city is required as a condition to the laying of said natural gas pipe line.

■ The question still remains in the case whether the state through its instrumentality, the city, may require the pipe line company, before laying its pipe line over the right of way of the bridge company to the Armour and Cudahy plants, to obtain the consent of the city, whether we call such consent a franchise or by any other name? In determining that question we must first consider the character of the act which is proposed by the pipe line company; that is to say, the completed matter of laying the pipe line, the selling, transporting, and delivering the natural gas to Armour & Company and the Cudahy Packing Company at their plants for use and consumption by those companies in the carrying on of their business. That such act in all of its incidents comprises interstate commerce can admit of no doubt in view of the repeated decisions of the Supreme Court of the United States. West, Attorney General of State of Oklahoma, v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Pipe Line Case, 234 U. S. 548, 34 S. Ct. 956, 58 L. Ed. 1459; Public Utilities Commission v. Landon, 249 U. S. 236, 39 S. Ct. 268, 269, 63 L. Ed. 577; Pennsylvania Gas Co. v. Public Service Commission, 252 U. S. 23, 40 S. Ct. 279, 281, 64 L. Ed. 434; Pennsylvania v. West Virginia, 262 U. S. 553, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300; Missouri ex rel. Barrett v. Kansas Gas Co., 265 U. S. 298, 44 S. Ct. 544, 68 L. Ed. 1027; Ozark Pipe Line v. Monier, 266 U. S. 555, 45 S. Ct. 184, 69 L. Ed. 439; People's Gas Co. v. Public Service Commission, 270 U. S. 550, 46 S. Ct. 371, 70 L. Ed. 726.

But the determination that the act in question constitutes interstate commerce does not entirely foreclose the question. It has long been well settled that not all burdens placed upon interstate commerce by a state are unlawful. The burden to be unlawful must be a direct one, and burdens are not considered direct burdens upon interstate commerce when they come to bear after interstate commerce has ceased and the article or commodity has become a matter of intrastate commerce, unless the burden be of such a character that in its nature reaches back and interrupts and destroys the interstate commerce itself.

Two of the cases heretofore cited are particularly instructive, in considering the present subject. I refer to Public Utilities Commission v. Landon, supra, and Pennsylvania Gas Co. v. Public Service Commission, supra. In the first case the Kansas Natural Gas Company had pipe lines extending from Oklahoma and Kansas points into the state of Missouri, and engaged in selling gas to local companies, physically connecting its line with the local companies' lines and receiving as compensation for their commodity certain percentages of the local rates charged by the local companies to consumers. The Kansas Natural Gas Company, while so conducting its business under contracts with local companies, passed into the hands of receivers, who continued the service without adopting the contracts. Thereafter because of a diminished supply of gas and the necessity for new wells, the receivers petitioned the Kansas Public Utilities Commission to permit higher charges, but the schedules asked were denied and lower schedules fixed. Thereupon the receivers began a suit in the United States District Court for Kansas against the Kansas Public Utilities Commission, Missouri Public Service Commission, and numerous local distributing companies, alleging the inadequacy and confiscatory character of the rates, and that such rates unduly burdened interstate commerce. On the trial the District Court held that the transportation of the gas and the sale to the consumers through the distributing companies was interstate commerce of a national character, and that the action of the commissions burdened interstate commerce, and enjoined the commissions and various municipalities and distributing companies from interfering with establishment of such reasonable and compensatory rates as the court might approve. The case was appealed directly to the Supreme Court of the United States, and was reversed and re-

manded. The Supreme Court in its opinion said:

"But we cannot agree with its conclusions that local companies in distributing and selling gas to their customers acted as mere agents, immediate representatives or instrumentalities of the receivers and as such carried on without interruption interstate commerce set in motion by them.

"That the transportation of gas through pipe lines from one state to another is interstate commerce may not be doubted. Also, it is clear that as part of such commerce the receivers might sell and deliver gas so transported to local distributing companies free from unreasonable interference by the state. American Express Co. v. Iowa, 196 U. S. 133, 143, 25 S. Ct. 182, 49 L. Ed. 417; Oklahoma v. Kansas Natural Gas Co., 221 U. S. 229, 31 S. Ct. 564, 55 L. Ed. 716, 35 L. R. A. (N. S.) 1193; Haskell v. Kansas Natural Gas Co., 224 U. S. 217, 32 S. Ct. 442, 56 L. Ed. 738.

"But in no proper sense can it be said, under the facts here disclosed, that sale and delivery of gas to their customers at burner-tips by the local companies operating under special franchises constituted any part of interstate commerce. The companies received supplies which had moved in such commerce and then disposed thereof at retail in due course of their own local business. Payment to the receivers of sums amounting to two-thirds of the product of these sales did not make them integral parts of their interstate business. In fact, they lacked authority to engage by agent or otherwise in the retail transactions carried on by the local companies. Interstate commerce is a practical conception and what falls within it must be determined upon consideration of established facts and known commercial methods. Rearick v. Pennsylvania, 203 U. S. 507, 512, 27 S. Ct. 159, 51 L. Ed. 295. The Pipe Line Cases, 234 U. S. 548, 560, 34 S. Ct. 956, 58 L. Ed. 1459. The thing which the receivers actually did was to deliver supplies to local companies. Exercising franchise rights, the latter distributed and sold the commodity so obtained upon their own account and paid the receivers what amounted to two-thirds of their receipts from customers. Interstate movement ended when the gas passed into local mains."

The Landon Case seems to clearly establish the rule that where the importing company delivers its gas to a local company by connecting with local mains that interstate

828

commerce ends when the gas passes into the local mains, and that after the gas passes into the local mains for local distribution to the general public it is subject to local regulation.

In the second case above referred to, the Pennsylvania Gas Company had pipe lines extending from the state of Pennsylvania into the state of New York and into various cities and towns in that state, and to points of local consumption. The Public Service Commission of the State of New York undertook to regulate the rates to be charged consumers. The jurisdiction of the commission being challenged in a suit in the state court of New York, it was finally held by the Court of Appeals of that state that the commission had such jurisdiction. Appeal was taken to the Supreme Court of the United States and the judgment of the state court affirmed. In the course of the opinion Mr. Justice Day said:

"The thing which the state commission has undertaken to regulate, while part of an interstate transmission, is local in its nature, and pertains to the furnishing of natural gas to local consumers within the city of Jamestown in the state of New York. The pipes which reach the customers served are supplied with gas directly from the main of the company which brings it into the state, nevertheless the service rendered is essentially local, and the sale of gas is by the company to local consumers who are reached by the use of the streets of the city in which the pipes are laid, and through which the gas is conducted to factories and residences as it is required for use. The service is similar to that of a local plant furnishing gas to consumers in a city.

"This local service is not of that character which requires general and uniform regulation of rates by congressional action, and which has always been held beyond the power of the states although Congress has not legislated upon the subject. While the manner in which the business is conducted is part of interstate commerce, its regulation in the distribution of gas to the local consumers is required in the public interest and has not been attempted under the superior authority of Congress."

It has long since been said and well settled that in determining whether a phase of interstate commerce is national in its character and therefore free, or local in its character and therefore subject to local regulation until Congress has seen fit to act upon the subject, one must give controlling effect to the facts in each particular case. With this principle in mind, one is led to an examination of the facts in the instant case to see how far they square with the facts in either or both of the two cases just referred to and quoted from. In the Landon Case and the Pennsylvania Gas Company Case in rendering service it was necessary to use the streets and public ways of the municipality. This is an important factor when considering the necessity for local regulation, and yet I think not an absolutely determinative one. There is another, the public character of the service. When one dedicates or subjects in a permanent way his property and enterprise to a public use, he necessarily assumes certain public obligations and submits to public regulation. And if the public use be local, then to local regulation unless some superior authority intervenes. In the Landon Case and Pennsylvania Gas Company Case the pipe line companies had undertaken to furnish public gas service to the citizens generally of municipalities of considerable proportions. They were not performing particular contracts, but had assumed a permanent status, holding themselves out and ready for the service of all. The supply of gas had not only been brought to these cities and towns, but had come to rest there and was being held available to all applicants for the service. The service was general and of a common character, meeting the demands of domestic use and local consumers of other classes. It was not brought into the state at the instance of particular consumers purchasing in interstate commerce, but was brought into the state in interstate commerce in contemplation of future local contracts and traffic. It was impressed locally with a public interest.

Now what are the circumstances of the instant case? A group of great industries are located contiguously. These great industries are engaged predominantly in interstate commerce. We have here first the bridge company operating its interstate bridge with its approaches under an act of Congress. We have numerous large packing plants located adjacent to a great stockyards, all of them functioning in interstate commerce under acts of Congress. The business and character of all these institutions are distinctly national. Now while the fact that these various institutions, the packing houses and the stockyards, are intimately connected and operating under regulations of Congress through the Packers and Stockyards Act (7 USCA § 181 et seq.), this fact does not in

itself indicate that Congress has acted upon the subject under discussion, but the character and purpose of these institutions is material to be considered in comparing a service furnished them or a transaction with them, with a general service furnished to all of the inhabitants of the city. The transaction between the pipe line company and the packing houses is not a usual or ordinary one. Here the packing houses, if they use gas for fuel, require a supply utterly out of comparison with that furnished ordinary consumers. They require a different kind of gas that can be furnished upon an entirely different basis of value. No general rule in that respect applicable to the public would meet their requirements or necessities. In this situation the question is: May they purchase natural gas in interstate commerce and have it brought in for their own consumption under particular and private contracts with a concern engaged in such interstate commerce but not engaged in any local public business? As I conceive it, this question must be answered in the affirmative. To say otherwise it seems to me would be to establish a precedent far in advance of any heretofore recognized and at variance with the principles heretofore announced in the adjudicated cases.

I therefore conclude that the injunction heretofore issued by the state court should be dissolved and the plaintiff's bill dismissed, and it will be so ordered.

It is further ordered that the facts and conclusions found and stated in the body of this opinion be adopted and filed as the findings of fact and conclusions of law in the case.

Let a decree be entered in conformity with this opinion.