## FROTHINGHAM v. ANTHONY.
### No. 2840.

Circuit Court of Appeals, First Circuit.
Feb. 16, 1934.
Rehearing Denied April 6, 1934.

William Flaherty, of Boston, Mass. (Lawrence S. Apsey, of Boston, Mass., on the brief), for appellant.

James M. Hoy, of Boston, Mass. (George Hurley, of Providence, R. I., and Richard C. Heaton, of Boston, Mass., on the brief), for appellee.

Before WILSON and MORTON, Circuit Judges, and LETTS, District Judge.

LETTS, District Judge.

This is an action at law to recover on a contract of guaranty. It is before us on defendant's bill of exceptions and assignments of error from a judgment for the plaintiff entered upon a verdict directed by the trial court.

In May, 1927, Andrew W. Anthony brought suit for divorce against his wife, Elizabeth C. Anthony, in the superior court of the state of Rhode Island. Within a few weeks thereafter the wife filed in the same court a counter suit against her husband requesting custody of their two minor children, S. Reed Anthony and Le Baron Colt Anthony, as well as an allowance for their education and support, and for an award of the furniture and other articles in their residence, as her separate property.

Contemporaneous with the execution of the cross petition by the plaintiff and three days prior to its filing, the parties on June 25, 1927, entered into a written agreement relative to matters of difference between them, which agreement was to be inoperative in event the court did not grant a divorce to Mrs. Anthony before a specified date. In this agreement the husband promised, in lieu of alimony and dower rights, which the wife expressly surrendered, to pay to her the sum of $250 per month for the support and education of each of the two sons until they respectively reached the age of 25 years, unless sooner deceased. Certain other monetary obligations were assumed

under this agreement by the husband and provision made for a reduction of these monthly payments when either of said children should be in actual attendance at a college or professional school, the expenses incident to which the husband assumed. The only provisions of the agreement under which the wife was to derive any specified personal benefit are contained in the third and eighth paragraphs; the former providing that, with the exception of a few articles, the wife should have all the household effects in their Providence residence, the latter, that the husband would pay the sum of $1,000 as a counsel fee to the solicitors of the wife. All payments to be made by the husband were specifically made binding upon his estate.

The second paragraph of the agreement, specifying the monthly sums to be paid by the husband for the support and education of the children, contained the following clause in reference to Mrs. Anthony's obligation, in event the court granted her a decision, to move for the entry of a final decree:

"But if said Elizabeth C. Anthony shall have failed to move for the entry of a final decree, then said payments shall be suspended until she does so move, but shall be resumed as soon as she so moves and shall continue thereafter until all of said payments have been made."

Under the provisions of the Rhode Island statute, the bond of marriage is not terminated until the entry of a final decree, which cannot be entered until after the expiration of a period of six months from the date of the "trial and decision."

On the same date that the aforementioned agreement was entered into between Andrew W. Anthony and Elizabeth C. Anthony another instrument was executed and delivered under seal by Harriet A. Frothingham, the mother of the husband. This instrument was entitled "Guarantee," and, following a recital of consideration as follows: "In consideration of the sum of one dollar ($1) and other good and valuable considerations to me paid by Elizabeth C. Anthony * * *" it provided:

"I, Harriet A. Frothingham, * * * do hereby for myself, my executors and administrators, guarantee the payment in full of all payments at the time or times when said payments may be due and payable, which have been undertaken to be made by my son, Andrew W. Anthony, in that certain agreement * * * a copy of which said agreement is attached hereto and made a part hereof.

"It is my express purpose to give, and I do hereby give, to the said Elizabeth C. Anthony an absolute unconditional continuing guarantee, binding upon myself, my executors and administrators, and I do hereby covenant for myself, my executors and administrators, that each and every payment specified in said agreement to be made by the said Andrew W. Anthony, or to be paid out of his estate, shall be made promptly and in full at the time or times specified in the said agreement without further notice or demand of any nature.

"And I further agree that this guarantee shall not in any way be affected, modified or annulled, so as to release, relieve, discharge, or modify my obligations hereunder in any manner, except by written consent of the said Elizabeth C. Anthony or someone in her behalf, authorized so to do, until said agreement has been completely and finally executed and until all payments therein provided for have been made and discharged in full."

Prior to the commencement of the present suit against Harriet A. Frothingham these payments were in arrears to the extent of $5,000. The defendant in her amended answer set up the following defense in denial of liability upon her agreement or covenant of guaranty: "And further answering the defendant says that said contract described in the plaintiff's declaration is an illegal contract and against public policy."

At the trial of the case before Judge McLellan, the only evidence introduced was documents comprising various petitions, motions, and decrees as entered in the superior court in Rhode Island in the divorce proceedings between the husband and wife, together with a copy of the agreement entered into between them and a copy of the undertaking signed by the defendant in this action. No evidence was offered by the defendant to establish any irregularities relative to the divorce proceedings in the Rhode Island Court; counsel for the defendant advising the trial court in effect that the defendant contended that upon the face of the documents they were illegal and against public policy. No serious contention can be made that the defendant in this action was not bound by her guaranty if the original settlement agreement between the husband and wife was valid and enforceable. This question is presented as the sole issue before us.

It is clear that the validity of this agreement must be determined by a consideration of the law of Rhode Island governing the matter of divorce. Both Mr. and Mrs. An-

thony resided in Rhode Island, and the divorce proceedings were brought in the Rhode Island courts. The settlement agreement here involved and the instrument of guaranty executed by the defendant to this action appear upon their face to have been entered into in that state.

It was said in the case of In re Burrus, 136 U. S. 586, 593, 594, 10 S. Ct. 850, 853, 34 L. Ed. 1500:

"The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."

A very considerable number of decisions cited by counsel for the appellant from other jurisdictions and generally dealing with the particular laws of those states are of little assistance. As was pointed out by the Rhode Island Supreme Court in the case of Leckney v. Leckney, 26 R. I. 441, 444, 59 A. 311, 312:

"Owing to the difference between the language of our statute and that of other states relating to the subject of divorce, but little aid can be obtained from the decisions of the courts of those states in regard to the proper construction of the statute before us."

Where questions of public policy are involved, it is the law of the state which controls. Hartford Insurance Co. v. Chicago, etc., Railway, 175 U. S. 91, 100, 20 S. Ct. 33, 44 L. Ed. 84; Northwestern Life Ins. Co. v. Johnson, 254 U. S. 96, 41 S. Ct. 47, 65 L. Ed. 155.

Chapter 291, § 18, General Laws of Rhode Island 1923, provides as follows:

"Sec. 18. No divorce from the bond of marriage shall be granted solely upon default nor solely upon admissions by the pleadings, nor except upon trial before the court in open session; nor shall such divorce be granted where the court is satisfied that there has been any collusion or corrupt conduct by the parties, or either of them, in regard to the proceedings to obtain the same."

Nowhere have we been able to discover from an examination of the reported decisions of the Rhode Island Supreme Court, in its interpretation of this and other sections of the statute, any inhibition placed upon the parties against undertaking by amicable agreement to adjust their differences in respect to collateral and incidental matters, provided that there be involved no collusion or fraud upon the court in respect to the trial upon its merits in open session of all matters relating to the severance of the bond of marriage between them. While that court seems to look with no disfavor upon such agreements between parties, thus often avoiding protracted trials and notoriety harmful to children and others, it still retains a jurisdiction under the statute, irrespective of the agreements entered into, to deal with the custody of children and their support, as well as any unexecuted portion of an agreement for the maintenance of a wife which is embodied in a final decree.

In the case of Brown v. Brown, 48 R. I. 420, 424, 138 A. 179, 181, the court said:

"An agreement between husband and wife for alimony, if it is fair and not designed to improperly influence the conduct of the parties in the proceedings for divorce or to mislead the court, is not opposed to public policy and is valid."

In the leading case of Phillips v. Phillips, 39 R. I. 92, 97 A. 593, 596, the court was dealing with a contract between husband and wife making provision by an executed trust for the support of their minor children and in full settlement of all claims for alimony *in event the wife should be granted a divorce.* The wife thereafter petitioned the court for an award of alimony, challenging the validity of the agreement which she had entered into with her husband as being a bar to her petition. The court in upholding the agreement in part said:

"The petitioner further objects to the decree appealed from on the ground that the trust agreement, on the provisions of which said decree is based, is not valid and enforceable. In support of this attack the petitioner has cited to us a number of cases from other jurisdictions, in which certain agreements between parties to divorce proceedings, with reference to the amount of the wife's alimony, have been considered. In some of the older of these cases such agreements have been disregarded, apparently because of the incapacity of the wife to contract with her husband until the bond of marriage had been dissolved. In a few others such agreements have been held to 'open a door for the attainment of divorce by collusion,' and hence to be against public policy and void. In most of the cases cited, while the courts recognized the competency of the parties to make such a contract, the particular agreement under consideration has been treated as a nullity, because the provisions contained therein were unjust to the wife, or because in the circumstances of the particular case the court found such agreement to be part of a collusive scheme to impose upon the court in which the divorce proceeding was pending.

"The broad terms of our statute with reference to the contracts which a married woman may make permit the petitioner to enter into this contract with her husband, and in our opinion agreements of this character are not in their nature void as being contrary to public policy."

The position thus taken by the Rhode Island Supreme Court has been repeatedly reaffirmed in later cases.

See Ward v. Ward, 48 R. I. 60, 135 A. 241 (1926); Brown v. Brown (1927), supra.

In the recent case of Reynolds v. Reynolds (R. I. 1933) 166 A. 686, 689, the court reviews many of its earlier decisions dealing with the validity of agreements entered into between parties in adjustment of pecuniary and other differences incident to divorce proceedings. The court reaffirms the doctrine of those cases and holds only, in addition thereto, that, where a contract between spouses has been entered into with respect to amount and payments of money in lieu of alimony, and is embodied in the decree of the court as a part thereof, its provisions remain subject to revision by the court under the statute, the same as if no agreement had been made. A dissenting opinion by Mr. Justice Hahn was rendered in this case, and in that dissent he says:

"In my opinion the method of enforcing a decree in a divorce case should in no manner be held to impair the obligation of a contract included as part of the decree. Incorporating the agreement in the decree must necessarily be by the consent of the parties. Such incorporation was undoubtedly made for the purpose of preventing either party from disputing the legality of the agreement—in short, to make it 'stronger and more binding.' In view of this fact, neither party should be permitted to claim that the reference to the agreement in the decree renders the agreement subject to change or destroys the binding effect thereof."

The agreement now before us was in no respect unusual or out of harmony with the limitations laid down by the Rhode Island courts. It is an agreement seemingly fair, certainly from the point of view of the divorced husband, as most of its provisions, apart from the clause relative to the household furniture, relate to the maintenance and support of the two minor sons. The agreement, so far as it deals with the custody and rights of visitation of these children, although remaining subject to revision or alteration by the court, is in no wise opposed to sound public policy. The essential provisions of the agreement were embodied in the final decree of the court itself. Nowhere does there appear the slightest direct evidence, nor basis for compelling inference, that the court was in any way misled or misinformed. As we have said, the defendant's principal contention was that the agreements were bad upon their face.

All such agreements as that here involved are naturally conditioned upon the event and effect of the court's decision. Such a condition is not a defiance of the Rhode Island statute, but a recognition that the parties may not bargain in respect to the continuance of the bond of marriage.

We have purposely refrained from here making reference to many decisions in other jurisdictions in harmony with the rulings of the Rhode Island court. The only question before us is whether the contract in suit was valid and enforceable under Rhode Island law; and in our opinion it clearly was.

The judgment of the District Court is affirmed, with interest and with costs to appellee.

WILSON, Circuit Judge (dissenting).

I regret my inability to concur in the majority opinion. Nothing herein contained is intended as any criticism of or reflection upon the court granting the divorce or counsel drafting the agreements herein involved. I am well aware of the liberality with which both courts and members of the bar have come to view the proceedings relating to divorce, and especially am I aware of the indifference of the public with reference to the ease with which the marital ties are being severed.

The practice in certain states and countries of granting divorces ad libitum, and the attitude of certain classes of people toward marriage and divorce long has been the subject of tabloid jokes. It matters not that many of the divorces obtained are of no validity in other states or countries than that in which they are granted, if, indeed, they are valid in the state where decreed. It is difficult to conceive of one so credulous as to believe that a party leaving his or her long-standing residence has any intent of taking up a residence in another state or in a foreign country where divorces are obtained with notorious ease, except for the purpose of obtaining a divorce. Lefferts v. Lefferts, 263 N. Y. 131, 188 N. E. 279, November 28, 1933; Andrews v. Andrews, 188 U. S. 14, 38, 23 S. Ct. 237, 47 L. Ed. 366.

A woman who, with her relatives, not long ago acquired considerable notoriety through her husband's acts in taking the law into his own hands and causing the death of a person alleged to have assaulted her, has recently proclaimed publicly that she was on her way to another state to obtain a divorce, not because she desired one, but because her husband wished it. Members of a well-known group now in the public eye take on and put off marital obligations seemingly at will.

With such an attitude of indifference as the public evinces to the practices which have grown up in recent years in severing the marital ties, it is little wonder that courts and counsel fail at times to examine critically agreements entered into by the parties in anticipation of a decree of divorce, and that practices have grown up in arranging for a divorce between the parties which, if questioned, would not stand the recognized tests of legality.

This action has grown out of an agreement between the appellee and her husband relating to an anticipated divorce between them, and an agreement by the appellant who guaranteed the carrying out of the agreement on the part of the husband, who was her son.

Suit was brought on the contract of guaranty in the District Court of Massachusetts. The evidence in the case consists of a petition for divorce filed by the husband in the superior court for Providence county in the state of Rhode Island, and an answer in the form of a cross-petition filed by the wife, an agreement between husband and wife, the contract of guaranty by the appellant, and the several decrees of the state court granting the divorce.

The District Court on the face of these documents held that the contract of guaranty was a legal and binding contract, and ordered the jury to bring in a verdict for the plaintiff for an agreed amount. The appellant contends that on the face of the record the agreement between the husband and wife was collusive, or at least was entered into to facilitate and induce the obtaining of an early divorce by the wife, and was against public policy and illegal, and therefore the contract of guaranty that the agreement on the part of the husband would be carried out in all its details cannot be enforced.

I think the appellant's contention should have been sustained. While the written agreement between the husband and wife related in part to subject-matter, the adjustment of which may be properly agreed upon by the parties prior to divorce, if it receives the sanction of the court, certain features of the agreements here involved in connection with the pleadings and the circumstances under which the agreements were made seem to me to show that the agreements, if not collusive, were clearly entered into in order to promote and induce the procuring of an early divorce by the wife, and were never shown to the court for its sanction.

The husband in this case filed his petition for divorce under oath on May 6, 1927, alleging that his wife, the appellee here, had been guilty of extreme cruelty toward him, which, if true, entitled him to a divorce. He also prayed for the custody of their two children. Nearly two months later, or on June 25, 1927, the appellee and her husband and the appellant entered into the agreements here in question, and at the same time the appellee filed an answer to her husband's petition in the nature of a cross-petition, alleging the recriminatory charge of extreme cruelty on the husband's part. It is well-established law that, if the charges in the petition and answer were proven, neither was entitled to a divorce. Church v. Church, 16 R. I. 667, 19 A. 244, 7 L. R. A. 385.

The public policy of the state of Rhode Island with reference to divorce is well expressed in the case of McLaughlin v. McLaughlin, 44 R. I. 429, 432, 117 A. 649, 650, in which case her eminent Chief Justice Sweetland said:

"Marriage and the family relation is regarded as one of the foundations of our social order. To many in our community the contract of marriage is a solemn obligation, requiring the sanction of religion, and one which should not be dissolved, save for the gravest reasons. * * * When the marriage relation is established, the state is deeply interested in its continuance. In his supplementary brief the respondent takes exception to the statement, made at the hearing, that divorces are not favored in the law, and calls our attention to the fact that they are expressly permitted under our statute. The two statements exactly declare our law and public policy. The state strongly desires a continuation of the marriage relation, and hence is unfavorable to divorce. When, however, one of the parties has been guilty of serious fault, subversive of the marriage, and *the other is entirely blameless*, then the law will permit a divorce, but upon the prayer of the innocent spouse only. * * * A petition for divorce, however, seeks to set aside a relation which the state desires shall continue for the good of society. In every proceeding

for divorce the state is a party, and the action has been called 'a triangular suit,' with the interests of the state under the protection of the court. Berger v. Berger, 44 R. I. 295, 117 A. 361. The state will not permit a divorce to be granted by default, nor upon admissions of the respondent made in the pleadings, but only upon affirmative convincing evidence that *the petitioner is without fault* and that the respondent has been guilty of an offense which is destructive of the marriage contract. After evidence warranting a decision in favor of the petitioner, the court may not enter a final and operative decree until six months after the decision. There are a number of apparent causes for this extended delay, among which some courts, with reason, have seen a purpose to give further opportunity for condonation and for reconciliation." (Italics supplied.) Also see Hurvitz v. Hurvitz, 44 R. I. 478, 119 A. 58.

The general rule as to the validity of agreements between husband and wife in anticipation of a divorce is well stated in 6 R. C. L. § 177, p. 772, as follows:

"The marital relation, unlike ordinary contractual relations, is regarded by the law as the basis of the social organization. The preservation of that relation is deemed essential to the public welfare. When the marriage relation has been assumed, it is indissoluble except by the solemn judgment of a court for some cause which, after severe and jealous scrutiny, the court shall find sufficient under the law to warrant the judgment. Agreements between the parties intended to facilitate the procuring of a divorce are considered a fraud upon the law and upon the courts which administer the law. Consequently, in order to discourage the making of such agreements, the courts ordinarily refuse to enforce any promise growing out of them. Public policy requires that the interests of the parties shall be disregarded. Though an agreement made in contemplation of a divorce often contains other provisions which, standing alone, are not invalid, yet when the general purpose of the agreement or some of its provisions is to facilitate the procuring of a divorce, the courts, notwithstanding the existence of legal grounds for divorce, have refused to enforce any part of the agreement. The rule has been applied to agreements between the husband and wife, as well as to agreements between either of them and a third party. The rule is most frequently applied where one of the terms of the agreement is a promise by one party not to contest the application of the other party for a divorce.

Where the parties agree that one shall bring a suit to dissolve the marriage, and that the other will make no defense, or a mere nominal defense, the agreement becomes collusive and fraudulent, and is without validity. Similarly it has been decided that an agreement that the defendant in a divorce suit shall refrain from taking steps to set aside a decree which has been wrongfully obtained is against public policy, and that an agreement not to make a motion for a new trial after a decree of divorce has been entered is just as vicious as an agreement not to defend the suit, although it has been declared that, in the absence of fraud, a settlement made while a motion for a new trial or an appeal could have been entered, will be sustained. Agreements conditional on divorce are likewise generally held to be against public policy."

The same standard of public policy in relation to marriage and its dissolution by divorce is recognized, I think, in all the states, even if not in practice in some of them, and the law stated in 6 R. C. L. supra, governing agreements in anticipation of divorce is supported by the authorities. Barngrover v. Pettigrew, 128 Iowa, 533, 104 N. W. 904, 2 L. R. A. (N. S.) 260, 111 Am. St. Rep. 206; Sayles v. Sayles, 21 N. H. 312, 317, 53 Am. Dec. 208; Blank v. Nohl, 112 Mo. 159, 169, 20 S. W. 477, 18 L. R. A. 350; Wolkovisky v. Rapaport, 216 Mass. 48, 50, 102 N. E. 910, Ann. Cas. 1915A, 809; Davis v. Hinman, 73 Neb. 850, 103 N. W. 668, 11 Ann. Cas. 376; Spreckels v. Wakefield (C. C. A.) 286 F. 465, 467; Moore v. Moore (C. C. A.) 255 F. 497, 502, 503.

The husband in the agreement between him and his wife, though not admitting that the appellee had a just and proper cause of divorce, openly stated that he was willing that she should obtain a divorce, naively adding, providing she can prove her case to the satisfaction of the court, and that he was willing to pay her counsel fees of $1,000 to prosecute her charges, provided a decree of divorce was obtained by the appellee before July 15, 1927.

While he did not expressly agree not to present his recriminatory charges in defense, that, I think, from the record in the case, was clearly the intent and understanding of the parties; a draft decree in favor of the wife was drawn at the time and made a part of the agreement; and the husband agreed, if a decree were granted, that he would not oppose the entry thereof, or, in other words, would not appeal therefrom. It was also stipulated that none of the agreements were binding unless a decree was obtained by the wife before

July 15, 1927, and a final decree was entered within eight months.

In Adams v. Adams, 25 Minn. 72, 80, and Sheehan v. Sheehan, 77 N. J. Eq. 411, 421, 77 A. 1063, 140 Am. St. Rep. 566, it was held that the voluntary payment of counsel fees to enable a wife to prosecute a petition for divorce was held to indicate that the husband did not intend to obstruct the "accomplishment of this object by any contest." A fortiori I think this would be so where the husband had previously filed a recriminatory petition, and the payment of counsel fees was made upon condition that the wife should obtain an interlocutory decree within three weeks and a final decree in eight months. It does not appear that the payment of counsel fees was ever allowed by the court or its sanction by the court requested. The elaborate arrangements in case of a decree of divorce being granted to the wife for the custody and support of the children are also suggestive of an inducement to prosecute her petition for divorce. The husband agreed to pay the wife $250 per month for the support of each child, whether needed or not, and whether such payments were ordered by the court, or whether he was liable after the children became of age, and without regard to any other question whatsoever, the wife to have absolute discretion in the disbursement of the money, and further agreed to bind his estate to continue the payments according to the agreement in case of his death. He also furnished a guaranty by the appellant that the payments would be made by him or out of his estate, and that the guaranty should not in any way be affected, modified, or annulled so as to release, relieve, or in any manner discharge or modify the obligations of the guarantor thereunder, except by consent of the appellee, until said agreement had been finally and completely executed.

In consideration of these agreements the wife waived all claims for alimony, though it might well be urged that payments in lieu of alimony were concealed in liberal provisions for the support and education of the children whether needed or not, the disbursement of the funds so provided being left to the absolute discretion of the appellee. These agreements, if carried out, take out of the hands of the court the right of the husband to obtain relief in case of a change in his circumstances.

It is certain, I think, that the court never saw the agreement between these parties. If it did, it did not give its sanction to all the provisions, as it did not include in its decree an approval of the counsel fees agreed upon, or that the payments for the support of the children should continue in case of the husband's death before the children reached the age of 25 years, or that the payments should be made whether or not the wife needed them for the support of the children, and regardless of the court's power to change them, and regardless of any other question whatsoever; nor did the court recognize and sanction the contract of guaranty.

Whether there was collusion was a question of fact, which it is suggested the appellant could have proved, if it existed; but to have done so would have shown that the divorce was invalid, which it is obvious, I think, that neither the appellant nor the husband has any desire to accomplish. As to whether the agreement was against public policy the appellant was content to rely upon the pleadings, agreements, and decrees as a question of law.

It may be conceded that agreements between husband and wife in anticipation of a divorce as to the support and custody of the children, or as to a division of property or alimony, while not binding on the court, may not be against public policy; but otherwise, I think, where there are recriminatory petitions, and concurrent with the wife filing her petition in her answer, the husband enters into an agreement with her in which he expresses himself as willing that the wife should obtain the divorce, and without the sanction of the court voluntarily agrees to pay $1,000 as counsel fees to enable her to obtain a divorce, but on condition that she obtain her decree within three weeks and her final decree within eight months, and makes no defense or offers no proof of his recriminatory charge, and also agrees to make payments beyond the power of the court to order, and whether ordered by the court or not, and regardless of all other questions or matters whatsoever, and whether needed by the wife for the support of the children or not, and not to appeal from a decree granting a divorce, and in connection therewith the husband furnishes a contract of guaranty to insure the payments agreed to, even in case of the husband's death, and the guarantor further agrees that the contract of guaranty shall not in any way be affected, modified, or annulled so as to release, discharge, or modify the guarantor's obligations thereunder, except by consent of the guarantee.

It is clear on the face of this record, I think, that the agreements were entered into, not only to facilitate the obtaining of a divorce, but to induce the wife to obtain an

early divorce, and were void as contrary to the public policy of the state of Rhode Island.

It is often said in support of the liberal attitude of some courts toward divorce: "Why compel them to live together, if they are mismated?" If that expresses the deliberate judgment of society, then change the laws defining the grounds of divorce and what constitutes a valid defense, and not compel the courts to wink at some of the present methods of procedure in order to conform to such a social standard.