## Richmond

THE CHESAPEAKE AND OHIO RAILWAY COMPANY v. CLIFTON FORGE-
WAYNESBORO TELEPHONE COMPANY.

April 23, 1976.

Record No. 750812.

Present, I'Anson, C.J., Harrison, Harman, Poff and Compton, JJ.

*Philip Lee Lotz* (*Lotz, Black, Coleman & Gudal,* on brief), for
plaintiff in error.

*Phillip C. Stone* (*W. W. Wharton; William Goode; Wharton, Ald-
hizer & Weaver,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

The question involved in this case is whether an exculpatory clause
in an agreement executed by The Chesapeake and Ohio Railway
Company and the Clifton Forge-Waynesboro Telephone Company
precluded Telephone Company from recovering damages to its prop-
erty proximately caused by the negligence of C & O. The trial court
held that recovery could be had, it being of opinion that the contrac-

tual exemption from liability for negligence found in the agreement was against public policy and void.

Telephone Company provides service to residents in and around Covington. C & O owns a right-of-way in Covington where its tracks cross Riverside Street by an overpass. Incident to extending service to residents west of the railroad tracks, and being desirous of placing underground cables under the Riverside overpass, Telephone Company executed an agreement with C & O, dated November 24, 1954, whereby C & O consented to the location of the cables on its right-of-way. The agreement signed by the parties is referred to as "a standard license agreement normally used by C & O for such purposes" and contains the following paragraphs, pertinent to the case:

1. "The Railway Company hereby licenses and permits the Licensee, at its sole risk and expense, to construct, maintain and operate a wire line consisting of two (2) 909 pair, lead-covered cables, together with necessary poles, towers, conduits, fixtures and other equipment under and across its right of way, tracks and wires and the wires of The Western Union Telegraph Company.

7. "The Licensee hereby assumes all risks of loss or damage of any nature to said wire line crossing and appurtenances, however caused, and releases the Railway Company from all liability on account thereof."

Pursuant to this agreement, Telephone Company ran wires aerially along poles owned by the Virginia Electric and Power Company to a pole on the north side and within a few feet of the overpass. The wires were then run vertically down the pole through a sheath and thereafter underground for approximately 64 feet under the C & O tracks and right-of-way. The wires emerged on the south side of the overpass and continued aerially along Riverside Street. On July 24, 1967, the parties executed a letter agreement which permitted additional cables to be placed by Telephone Company on the railroad right-of-way, and at this time the 1954 agreement was reaffirmed.

On September 9, 1971, a number of coal cars from trains operated by C & O derailed at the Riverside Street overpass. As a result of the derailment, the sheath and many of the cables inside it were damaged in the amount of $25,000. Neither the amount of the damage nor the proximate cause thereof is in issue. C & O admits that except for the

exemption from negligence clause found in its license agreement, Telephone Company would be entitled to recover.

■ Telephone Company maintained, and the trial court agreed, that the law of the case is controlled by *Johnson's Adm'x* v. *R. & D. R. R. Co.*, 86 Va. 975, 11 S. E. 829 (1890). There the decedent Johnson was a member of a firm of quarrymen who entered into a written agreement with the railroad company for the removal of a granite bluff on the company's right-of-way. A part of the agreement was that the railroad would not be held responsible for any injuries to, or the death of, any member of the firm sustained from the work. In addition, it was understood that the trains of the railroad, in passing the bluff where the work was being done, would run at a speed not exceeding 6 miles an hour. While performing work under the agreement, Johnson was involved in an accident allegedly caused by the negligence of the railroad company. There was evidence to indicate that at the time he was injured the train involved was running at a speed of not less than 25 miles an hour. The trial court instructed the jury that if Johnson executed the agreement with the railroad company, he was precluded from recovering in the case. The court refused all instructions dealing with a violation of the promise of the railroad to limit the speed of its trains. We reversed a finding for the railroad and remanded for a new trial. In the course of our opinion we said:

"It was very properly conceded in the argument that the instruction given by the circuit court is erroneous. The theory of that instruction is that the fifth clause of the written agreement, although it, in effect, stipulates for exemption from liability even for the consequences of the company's own negligence, is notwithstanding valid, and consequently precludes a recovery by the plaintiff, whether the company was negligent or not. It would be strange, indeed, if such a doctrine could be maintained. To uphold the stipulation in question, would be to hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct, which can never be lawfully done where an enlightened system of jurisprudence prevails. Public policy forbids it, and contracts against public policy are void. Nothing is better settled, certainly in this court, than that a common carrier cannot by contract exempt himself from responsibility for his own or his servants' negligence in the carriage of goods or passengers for hire. This is so independently of section 1296 of the Code; and the principle which vitiates a stipulation for exemption from liability for one's own negligence,

is not confined to the contracts of carriers as such; it applies universally. . . ." 86 Va. at 978, 11 S. E. at 829, 830.

We observe that at the time of the decision in *Johnson*, the applicable statute in Virginia read:

"No agreement made *by a common carrier* for exemption from liability for injury or loss occasioned by his own neglect or misconduct, shall be valid." Virginia Code 1887, § 1296. [Emphasis supplied]

Subsequent to the decision, in the year 1904, § 1296 of the 1887 Code was repealed and a new section enacted which read as follows:

"No agreement made by a transportation company for exemption from liability for injury or loss occasioned by its own negligence or misconduct *as a common carrier* shall be valid." Virginia Code § 3930. [Emphasis supplied]

The present statute, successor to Code § 3930, is Code § 56-119 and provides:

"**Contracts, etc., limiting liability invalid.**—No contract, receipt, rule, or regulation shall exempt any transportation company *from the liability of a common carrier* which would exist had no contract been made or entered into and no such contract, receipt, rule, or regulation for exemption from liability for injury or loss occasioned by the neglect or misconduct of such transportation company *as a common carrier* shall be valid. (Code 1919, §§ 3926, 3930.)" [Emphasis supplied]

Telephone Company argues that the *Johnson* case is controlling precedent in Virginia and clearly requires that the judgment in this case be affirmed. It points to language in the opinion which holds that the principle which vitiates a stipulation for exemption from liability for one's own negligence is not confined to the contracts of carriers as such, but "it applies universally". Appellee says that it is obvious therefrom that this Court has not limited the proscription against exculpatory clauses to carriers alone. It also cites a footnote found in 53 Va. L. R. at 1869 (1967), where, referring to *Johnson*, it was said: "No later Virginia case has rejected this opinion's fair and forward-looking conclusion. . . ."

While we have had no occasion since *Johnson* to consider the precise issue involved here, that case was the subject of comment by the

Supreme Court in *Hartford Ins. Co.* v. *Chicago & c. Railway*, 175 U. S. 91 (1899). There the Court considered a section of the Code of Iowa which provided that: " 'no contract, receipt, rule or regulation shall exempt any corporation, engaged in transporting persons or property, by railway, from liability of a common carrier, or carrier of passengers, which would exist had no contract, receipt, rule or regulation been made or entered into.' " 175 U. S. at 104. The Court noted that the Iowa statute had been rigidly enforced by the Supreme Court of Iowa in suits against railroad corporations "as carriers", but no intimation had been made that it applied to them in any other relation. The Court held that the contract there involved was not made by the railway company in its capacity as a common carrier, and that the provision of the Iowa statute was not applicable. In his opinion Mr. Justice Gray, speaking for the Court, said:

> "The plaintiffs further insisted that the same reasons apply universally, and should be held to defeat all contracts by which a party undertakes to put another at the mercy of his own faulty conduct. But the only authorities cited which support this proposition are a general statement in Cooley on Torts, 687, and an *obiter dictum* in *Johnson* v. *Richmond & Danville Railroad*, 86 Va. 975, 978; and it is certainly too sweeping." 175 U. S. at 98.

The general rule on the effect of an agreement by which a lessee or licensee agrees to exempt or indemnify a railroad against liability to a third party or to himself for damage caused by that railroad's negligence is stated in 14 A. L. R. 3d, at 453 (1967), as follows:

> "The rule is well established that a railroad acting as a common carrier may not contract for indemnity against its own tort liability when it is performing either a public or quasi-public duty such as that owing to a shipper, passenger, or servant, and that such contracts are void as against public policy. But when a railroad is called upon to perform a service which it is not compelled to perform by the very nature of its operation as a common carrier, it may, under proper conditions, contract against its liability for negligence for the reason that it is then acting in the capacity of a private carrier. [Footnotes omitted]"

In *Santa Fe Railway* v. *Grant Bros.*, 228 U. S. 177 (1913), Mr. Justice Hughes, later Chief Justice, said:

"It is the established doctrine of this court that common carriers cannot secure immunity from liability for their negligence by any sort of stipulation. . . . A carrier who stipulates not to be bound to the exercise of care and diligence 'seeks to put off the *essential duties* of his employment.' It is recognized that the carrier and the individual customer are not on an equal footing. . . . For these reasons, the common carrier in the prosecution of its business as such is not permitted to drop its character and transmute itself by contract into a mere bailee with right to stipulate against the consequences of its negligence.

"Manifestly, this rule has no application when a railroad company is acting outside the performance of its duty as a common carrier. In such case, it is dealing with matters involving ordinary considerations of contractual relation; those who choose to enter into engagements with it are not at a disadvantage; and its stipulations even against liability for its own neglect are not repugnant to the requirements of its public service." 228 U. S. at 184, 185.

Or, as succinctly stated in *Thomas* v. *Atlantic Coast Line R. Co.*, 201 F. 2d 167, 169 (5th Cir. 1953):

"[I]t is generally recognized elsewhere that a common carrier may contract against ordinary negligence on its part when not acting in the capacity of a common carrier." *See also* 65 Am. Jur. 2d, Railroads, § 390 (1972); 15 M. J. Railroads, § 46; and Annot., 14 A.L.R. 3d 446 (1967), and cases there cited.

The issue which confronts us here was involved in *Aetna Ins. Co.* v. *Atlantic Coast Line R. Co.*, 79 F. 2d 463 (4th Cir. 1935). There, one Plummer, Aetna's insured, applied to the railroad for the construction of a spur track to serve a manufacturing plant to be erected on his land. The owner and the railroad company executed an agreement, the effect of which was to save and hold the railroad harmless from and against any and all liability for damages that might be sustained by the owner or third parties by reason of fire originating through the operation of the railroad. A fire loss did occur. In affirming a verdict in favor of the railroad, the court held that the agreement was valid and was "not void as against public policy under the Virginia rule". The court noted that the general rule had been concisely stated in 51 Corpus Juris, p. 1185 to be: " 'A railroad company may, when acting in its private capacity, relieve itself from an absolute liability imposed by

statute for setting fire to property *as well as from liability resulting from negligence.* \*\*\*' " [Emphasis supplied] 79 F. 2d at 465. And it further observed that the federal courts and a majority of the state courts hold that contracts, in consideration of some privilege or concession granted by a railroad company which it would not otherwise be bound to extend, exempting it from liability for the destruction of buildings, are valid and enforceable.

In *Aetna,* the attorneys for the appellants also relied mainly upon *Johnson's Adm'x* v. *R. & D. R. R. Co., supra.* The court noted that in *Hartford* the Supreme Court referred to the decision in *Johnson* as *obiter dictum* and as too sweeping. It further said that "The Johnson Case has been considered in decisions of other state courts, and the doctrine therein laid down repudiated." The court in *Aetna* then proceeded to consider the changes in the statute made by the General Assembly of Virginia after the *Johnson* decision and said:

> "Since the enactment of the statute in 1904 we can find no opinion of the highest court of Virginia directly bearing upon this question. It cannot be doubted that the Virginia Legislature considered the decision in the Johnson Case when it reenacted this statute, and even though the contract of exemption, here considered, may have been, under the decision in the Johnson Case, prohibited by the statute as it then was, we are of the opinion that it did not come within the inhibition of the statute of 1904. To ignore the change from 'any agreement made by a common carrier' to 'any agreement made by a transportation company as a common carrier' would be to disregard entirely the evident intent of the Legislature, and the plain meaning of the words used. While the contract in question was made by the Railroad in the furtherance of its business as a carrier, it was not a contract made for the carriage of passengers or property. E. L. Cleveland Co. v. Bangor & A. R. Co., 133 Me. 62, 173 A. 813, 814." 79 F. 2d at 466.

We regard the analysis of the statutes made by the court in *Aetna* as both logical and sound. At the time *Johnson* was decided the statute (§ 1296 of the Code of 1887) clearly prohibited an agreement by a common carrier for exemption from liability occasioned by its negligence or misconduct. The amendments thereafter made were substantial. Not only was "transportation company" substituted for "common carrier", but the statute was also narrowed to render invalid an agreement for exemption from liability for injury or loss

occasioned by the negligence of a transportation company *as a common carrier*.

▮ Telephone Company would have us construe Code § 56-119 as if the words "as a common carrier" were omitted therefrom. As Circuit Judge Northcott pointed out in *Aetna*, to do this "would be to disregard entirely the evident intent of the Legislature, and the plain meaning of the words used". We are of the opinion that the rule followed by a majority of the states that a railway company not acting as a common carrier may exempt itself, by contract, from liability for negligence is sound. *See Cacey* v. *Virginian Ry. Co.*, 85 F. 2d 976 (4th Cir. 1936) and cases therein cited.

In the instant case C & O was under no obligation or duty to grant Telephone Company the right-of-way in question. The contract was for the benefit of Telephone Company, and it has enjoyed all the rights, privileges and benefits thereunder since November 24, 1954. C & O was acting in its private capacity and not as a common carrier, and therefore it could impose any conditions that it desired and which Telephone Company was willing to accept. Telephone Company was under no compulsion to accept the agreement. It could have sought an alternative right-of-way from another source, or, if such were not available or practical, it could have, if necessary, resorted to its right of eminent domain provided for by Code § 56-464.

It is a matter of common knowledge that, in addition to their rights-of-way for tracks, stations, freight yards, etc., railroads frequently acquire large acreage of land along these rights-of-way in order to promote the growth of their business and that of the communities they serve. The selling, leasing, renting and developing of such properties, and the granting of easements across their properties and rights-of-way, seldom relate to any of the duties imposed by law upon a railroad "as a common carrier".

In the agreement involved here C & O did not assume thereby to relieve itself of any of its essential duties as a common carrier or as a quasi-public corporation. The signing of the lease had no bearing on these duties and liabilities. Its only effect was to relieve the railroad from any liability that might attach to it by reason of the construction, maintenance and operation by Telephone Company of the wire line across the railroad's right-of-way.

Since C & O was under no duty to lease any of its right-of-way to Telephone Company, and Telephone Company was not compelled to lease from the railroad, the parties stood upon an equal footing. Each

was free to make or refuse to make the contract and to bargain "at arms length" over terms and conditions. In this case C & O acted as a private property owner, not as a common carrier, and neither public welfare nor public policy was involved.

Accordingly, we reverse the judgment of the trial court and enter final judgment here for the appellant.

*Reversed and final judgment.*