722 F.2d 55
 Edith GILL, individually and as committee of Joseph E. Gill;
United Services Automobile Association, Appellees,
v.
ROLLINS PROTECTIVE SERVICES COMPANY, a Delaware Corporation,
Appellant.
 No. 82-1251.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 13, 1983.
Decided Nov. 28, 1983.
 
 David P. Durbin, Washington, D.C. (John O. Easton, Carr, Jordan, Coyne & Savits, Washington, D.C., on brief), for appellant.
 John G. Gill, Jr., Rockville, Md. (Chris Marder, Gill & Sippel, Rockville, Md., Susan L. Korfanty, on brief), for appellees.
 Before WIDENER and ERVIN, Circuit Judges, and FIELD, Senior Circuit Judge.
 WIDENER, Circuit Judge:
 
 
 1
 Edith Gill brought this diversity action against Rollins Protective Services Company (Rollins) on behalf of herself and as committee of her husband for damages resulting from the burning of their house, in which Rollins had installed a fire alarm system. Upon Rollins' motion, the Gills' subrogated home insurer, United States Automobile Association, was added as a real party in interest. The case was submitted to a jury on theories of common-law negligence and violations of Virginia's Consumer Protection Act. VA.CODE ANN. Sec. 59.1-196 et seq. The jury returned a general verdict for the plaintiffs for $238,032.78, and Rollins appealed. We vacate and remand for a new trial.
 
 
 2
 In late August 1978, Rollins solicited Mrs. Gill by telephone to purchase its fire and burglary alarm service. A few weeks earlier, her husband had set fire to a waste paper basket, but had managed to put out the fire by himself. The husband, who suffers from Alzheimer's Disease, and had been adjudicated incompetent to handle his own affairs, was often careless with his burning cigarettes and would empty his ashtrays into paper bags. His disease rendered him quite unaware of the dangers of his actions.
 
 
 3
 Mrs. Gill, who had to leave her husband home alone during the day while she worked, was thus very interested in the service Rollins was offering. A salesman for Rollins visited her and explained that the service was for fire and burglary detection. Mrs. Gill told him about the previous fire and why it had occurred. She described her husband's mental condition, his smoking habits, and that he spent most of his time in the study. Mrs. Gill found that the charges for the combined fire and burglary service were more than she wanted to pay. She declined to subscribe to Rollins' service.
 
 
 4
 A few days after his visit, the salesman called back to tell Mrs. Gill he had "the absolute system for [her] that would work perfectly." He described the system as virtually foolproof and capable of automatically calling the fire department for help. The system was wireless, and, when installed, Mrs. Gill would absolutely not have to worry about telephoning the fire department. Her only worry would be to leave the house safely, and the system would automatically notify the fire department of all relevant information. In fact, a telephone answering service monitored the Rollins system and made any necessary telephone calls. While the salesman said nothing about how the Rollins telephone dialer mechanism would reach the fire department, Mrs. Gill understood that the Rollins system would reach the fire department directly.
 
 
 5
 The salesman also gave Mrs. Gill a brochure, "Your Personal Security Analysis," describing the Rollins system. According to the brochure, the virtually foolproof wireless system would continuously monitor the house and automatically notify the proper authorities over the customer's existing telephone system, in the event of a fire. The system would sound inside and outside alarms and turn on indoor lights. Because the system was wireless and contained its own emergency power source, the paper went on, it had no lines that could be cut, thus rendering it inoperative in a fire.
 
 
 6
 Mrs. Gill decided to subscribe to Rollins' service, and she signed its "Installation-Service Agreement," which she had glanced over. The Agreement, which is a form contract furnished by Rollins, says nothing about the system's supposed capabilities or Rollins' monitoring responsibilities. On September 9, 1978, Rollins installed a fire alarm system in the Gill house. Although Mrs. Gill had told Rollins about her husband's condition and habits, and his spending most of his time in his basement study, Rollins put no fire or smoke detectors in the study.
 
 
 7
 Just after midnight, April 11, 1979, before she went to bed, Mrs. Gill smelled an odor like that of a hot new appliance. She, at that time, was in the kitchen immediately above the study. Mrs. Gill thought nothing of that until she was later awakened by the outside alarm of the Rollins system. The inside alarm, however, did not sound; nor did the inside lights turn on. Mrs. Gill saw that the basement was filled with dense smoke. After attempting to save her dogs from the fire, she and her husband left the burning house and waited for the fire department. She did not telephone for help because of Rollins' advice to her that she would have nothing to worry about in case of a fire except getting out of her house. Neighbors, concerned about the alarm, telephoned the local Emergency Communications Center, which eventually dispatched a police car to the Gills' house. Upon arriving and seeing the flames, the police called for fire equipment. The Emergency Communications Center had no record of receiving an alarm from Rollins, and Rollins had no record of an alarm sent from the Gills' house. The house was totally destroyed by the fire, which investigation revealed was started by careless smoking in the Gills' basement study.
 
 
 8
 Steven Swab, a fire cause and origin expert, investigated the fire at the Gills house. He found that the fire started about 12:20 a.m., ten minutes or so before Mrs. Gill smelled the peculiar odor. The fire burned for 30 to 40 minutes before spreading beyond the study. At trial, Swab opined that the Rollins system was inadequate because, among other reasons, it did not have a fire or smoke detector in the basement study. His opinion was that (because help would have been obtained), a fire would not have spread beyond the study if the room had had a smoke detector. Furthermore, if the fire alarm had been properly transmitted when the external alarm sounded, the fire could have been confined to one quarter of the basement.
 
 
 9
 Swab further testified that the Rollins system was improperly installed and inadequate because it had no line-seizure device. This device, which costs about $20, would have preserved the system's ability to call out if any one extension telephone line of the four in the house had been destroyed by fire, leaving the central line intact. The system that Rollins installed lost its ability to call out when any telephone line shorted out.
 
 
 10
 Rollins had a line-seizure device available when it installed its system, but never told Mrs. Gill about it. The central alarm box was in the basement laundry room, separated from the origin of the fire by a masonry wall. This box, which was eventually destroyed with the house, if it had been fitted with a line-seizure device, would have remained intact long enough to make a telephone call when the external alarm sounded, even though other wiring within the house had burned and shorted out.
 
 
 11
 The "Installation-Service Agreement," which Mrs. Gill signed two days after Rollins installed its system, contained the following provision with respect to damages:
 
 
 12
 It is further agreed that Rollins is not an insurer of the Customer's property and that all charges and fees herein provided for are based solely on the cost of installation, service of the system and scope of liability hereinafter set forth and are unrelated to the value of the Customer's property or the property of others located in the Customer's premises.
 
 
 13
 The parties agree that if loss or damage should result from the failure of performance or operation or from improper installation or servicing of the system, that Rollins liability, if any, for the loss to a sum equal to ten (10%) percent of one year's service charge or $250.00, whichever sum is the greater, and that the provisions of this paragraph shall apply if loss or damage, irrespective of cause or origin, results, directly or indirectly to person or property from performance or non-performance of obligations imposed by this Agreement or from negligence, active or otherwise, of Rollins, its agents or employees.
 
 
 14
 Under the Agreement, ten percent of Mrs. Gill's annual service charge was $29.76. Therefore, the $250 figure would apply in this case.
 
 
 15
 The district court ruled that this part of the Agreement was unlawful under the Virginia Consumer Protection Act, VA.CODE ANN. Sec. 59.1-200(M), and instructed the jury that it was not to be so limited in rendering any award to the plaintiffs.
 
 
 16
 The briefs of the parties have proceeded on the assumption that the contract provisions with respect to limiting Rollins' liability for damages should be evaluated by the legal criteria for the validity of liquidated or limited damages for violation of a contract. This case, however, was never presented to the jury on a breach of contract theory, that having been taken out of the case along the way. The limited damage provision in the contract is relevant only to the extent that it affects recovery of damages for negligence or for violation of the Virginia Consumer Protection Act, and is as follows:
 
 
 17
 "... the provisions of this paragraph [limiting liability] shall apply if loss or damage, irrespective of cause or origin, results ... from negligence, actual otherwise, of Rollins, its agents or employees."
 
 
 18
 The limiting provision then, in terms, applies to limit damages to $250 for loss resulting "from negligence." From at least as long ago as 1890, the rule in Virginia precluded a party from exempting himself from liability for negligence. Johnson's Adm'x v. Richmond & Danville RR. Co., 86 Va. 975, 11 S.E. 829 (1890). In 1976, however, the Virginia Supreme Court rejected the broad reach of the rule stated in Johnson's Adm'x and held that a railroad, when not acting as a common carrier, may exempt itself from liability, on account of negligence for property damage, in a contract with another party who stands on equal footing with it. Chesapeake & Ohio RR. Co. v. Clifton Forge-Waynesboro Tel. Co., 216 Va. 858, 864, 224 S.E.2d 317, 322 (1976). The Court noted that the other party, a telephone company, was under no compulsion to lease a right of way from the railroad and that because the railroad was not shirking any of its duties as a common carrier or as a quasi-public corporation, neither public welfare nor public policy was involved. This most recent teaching by the Virginia Supreme Court means, we think, that a party such as Rollins may exempt itself from liability for negligence in a contract with a party on equal footing.
 
 
 19
 The limiting provision in the Rollins contract does not in terms attempt to limit Rollins' liability for violations of the Virginia Consumer Protection Act. Because of that, and especially in view of the rule that such limitations of liability are not favored and are strictly construed, see Fairfax Gas & Supply Co. v. Hadary, 151 F.2d 939, 940 (4th Cir.1945) (diversity case arising under Virginia law), we do not read such a limitation into the contract, even if it be valid and enforceable. Cf. Restatement (Second) of Contracts Secs. 179, 195. The contractual agreement between the parties, therefore, is not a defense to, and does not limit any liability for, damages under the Virginia Consumer Protection Act.
 
 
 20
 Since the case will be tried again, we should decide one of the other questions raised in the briefs. Rollins maintains that the district court erred in charging the jury in almost the precise language of the Virginia Consumer Protection Act, which to date has not been the subject of any published judicial interpretation in Virginia courts. After consideration of the court's charge and the exceptions thereto, we conclude that the jury was given a fair statement of the law, legally correct and applicable to the parties' controversy, and free from justifiable exception.
 
 
 21
 In this diversity action, the jury was presented with two theories of recovery, and it returned a general verdict for the plaintiffs. Under the negligence theory, Mrs. Gill may recover only $250, unless she shows that she and Rollins were not on equal footing. Chesapeake & Ohio RR. Co., supra, 224 S.E.2d at 322. The parties at trial did not contest whether they were on equal footing, and we cannot say on this record that any exception which may exist to the rule of Chesapeake & Ohio RR. Co. has been met. At a new trial, Mrs. Gill should have an opportunity to show that the limitation clause is ineffective as to her cause of action for negligence if she can show, for example, that she was not on equal footing with Rollins.
 
 
 22
 As before discussed, under the statutory theory of recovery, Mrs. Gill may recover her damages regardless of the limitation clause in the contract, while upon the negligence theory her damages may be limited to $250. Because we cannot say which theory was the basis of the jury's verdict, the judgment must be vacated and the case remanded for a new trial. United New York and New Jersey Sandy Hook Pilot Ass'n. v. Halecki, 358 U.S. 613, 619, 79 S.Ct. 517, 520, 3 L.Ed.2d 541 (1959). Upon a new trial, we suggest that separate verdicts, as to negligence on the one hand and the statutory cause of action on the other, are appropriate.
 
 
 23
 VACATED AND REMANDED.